# EXHIBIT A

1  TIMOTHY J. GORRY  (SBN 143797)
   tgorry@mrllp.com
2  JON-JAMISON HILL  (SBN 203959)
   jhill@mrllp.com
3  VINCENT LOH  (SBN 238410)
   vloh@mrllp.com
4  **MICHELMAN & ROBINSON, LLP**
   10880 Wilshire Boulevard, 19th Floor
5  Los Angeles, CA 90024
   Telephone: (310) 299-5500
6  Facsimile:  (310) 299-5600

7

8  Attorneys for Plaintiff

9

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**06/08/2021**
**Clerk of the Court**
**BY: EDWARD SANTOS**
Deputy Clerk

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                **FOR THE COUNTY OF SAN FRANCSICO**

12

| | |
|---|---|
| 13  COMMERCE HOME MORTGAGE, LLC, a California limited liability company, | Case No.: CGC-21-588997 Hon. Samuel K. Feng |
| 14 | |
| 15                          Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| 16            vs. | (1) **FRAUD** (2) **VIOLATIONS OF CAL. BUS. & PROF. CODE §17200**, *et seq.* |
| 17  FEDERAL HOME LOAN BANK OF SAN FRANCISCO, a federally chartered corporation; and | (3) **BREACH OF CONTRACT** |
| 18 | |
| 19  DOES 1 through 10, inclusive, | **JURY TRIAL DEMANDED** |
| 20                          Defendants. | Complaint Filed: January 15, 2021 |
| 21 | Trial Date: Not Assigned |

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT**

PLAINTIFF COMMERCE HOME MORTGAGE, LLC ("*Plaintiff*" or "*Commerce*") alleges the following:

## INTRODUCTION

1.      This action centers on Commerce's membership in the Federal Home Loan Bank of San Francisco ("*FHLB-SF*").  The membership process for FHLB-SF is, in a general sense, like that of any other club, organization, or cooperative.  A prospective member applies, demonstrates that it meets the membership criteria, pays its membership dues, and then enjoys the benefits of membership.  Unfortunately, despite the straightforward nature of Commerce's qualifications for membership in FHLB-SF, that is not how the process worked for Commerce.

2.      Commerce applied for membership in FHLB-SF and provided the extensive documentation necessary to support its application.  Commerce underwent a months-long application review process, through which FHLB-SF extensively investigated Commerce, its management, its business, its strategy, its operations, and its financials.  FHLB-SF formally accepted Commerce as a member.  Commerce then paid FHLB-SF nearly $1,100,000 in capital contributions, akin to Commerce's membership "dues."  But when it came time for Commerce to enjoy the benefits of membership, and specifically the credit facilities that would allow Commerce, as a certified Community Development Financial Institution ("*CDFI*"), to provide lower cost mortgages and other financial services to Commerce's historically underbanked and primarily minority customers, FHLB-SF offered only delays and excuses as to why it would not extend credit to Commerce.  Meanwhile, FHLB-SF utilized Commerce's member capital contributions to benefit itself and its other members.

3.      Ultimately, after nine months of being a member without receiving any benefits whatsoever (but being subjected to extraordinary and unexpected costs caused by FHLB-SF), FHLB-SF unexpectedly rescinded Commerce's membership on the pretextual excuse that Commerce never met the financial liquidity requirements for membership, despite FHLB-SF having previously investigated Commerce's financial condition through the exhaustive application process and having confirmed that Commerce met FHLB-SF's membership criteria in a formal resolution adopted by FHLB-SF's Board.

*///*

**FIRST AMENDED COMPLAINT**

4.     As discussed at length below, Commerce was the victim of a fraudulent scheme and decades-old, discriminatory policies and practices of FHLB-SF.  This action seeks to hold FHLB-SF accountable for its troubling, offensive, and illegal conduct.

## JURISDICTION AND VENUE

5.     This action is properly brought in this jurisdiction pursuant to California Code of Civil Procedure section 395, because at least one of the defendants is located and resides within the County of San Francisco.

## THE PARTIES

6.     Commerce is organized as a California limited liability company, with its principal place of business located at 16845 Von Karman Avenue, Irvine, California.

7.     At all times relevant to this action, FHLB-SF was, and is, a federally chartered corporation, with its principal place of business located at 333 Bush Street, San Francisco, California.

8.     The true names and capacities of the persons named herein as Does 1 through 10, inclusive, are presently unknown to Commerce, who therefore sues said persons by such fictitious names.  Commerce will seek leave to amend this complaint to show the true names and capacities of these Doe defendants when their identities have been ascertained, or according to proof at trial.

9.     Commerce is informed and believes and, on that basis, alleges that at all times mentioned herein, each of the defendants sued as Does 1 through 10, was the agent or employee of FHLB-SF, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and with the permission, consent of and ratification by such other defendants.

## FACTS UNDERLYING ALL CAUSES OF ACTION

**A.     Commerce Applies for Membership in FHLB-SF**

10.     Founded in 1994, Commerce is a mortgage banking company that is certified by the United States Department of the Treasury as a CDFI.  Commerce's primary purposes are to provide financing to underserved and underbanked borrowers, to advance community development and to expand access to capital to creditworthy borrowers who are underbanked and underserved, including Black, Latino/Hispanic and low income borrowers and communities.  Commerce has ably serviced

**FIRST AMENDED COMPLAINT**

1  these historically underserved communities, and Commerce originated over $7,000,000,000 in loans

2  in 2020 alone.  As of December 31, 2020, over seventy percent of the loans held on Commerce's

3  balance sheet were made to Black, Latino/Hispanic, and low income borrowers and communities.

4      11.    As a CDFI, Commerce is required to ensure that over sixty percent of its loan

5  originations are made to underserved populations such as low-income and underserved minority

6  borrowers.  To that end, the four CDFI fund approved target markets for Commerce are: (1) African-

7  American; (2) Hispanic; (3) low income individuals; and (4) low income communities in California.

8  Commerce is one of the largest, most successful, and most creditworthy CDFIs in the country.  By

9  all counts, Commerce is an example of corporate America doing the right thing.

10      12.    Eighteen Federal Home Loan Bank member banks have provided Commerce with

11  equity financing to increase access to capital for Black, Latino, and low income borrowers in their

12  communities.  Additionally, Commerce is an approved seller-servicer of Fannie Mae, Freddie Mac,

13  and Ginnie Mae (including being approved to originate loans for the Federal Housing Administration,

14  Department of Veterans Affairs, and Department of Agriculture), and has secured almost

15  $1,000,000,000 in credit facilities from FDIC insured banks to fund its loans.  As of December 31,

16  2020, Commerce boasted over $1,000,000,000 in assets, $100,000,000 in liquidity from cash and

17  cash equivalents, and an investment grade credit rating of "A" issued as recently as November 2020

18  from Egan Jones – the National Credit Rating Agency.

19      13.    Not surprisingly, Congress has recognized the important role that CDFIs like

20  Commerce play in the Federal Home Loan Bank system.  For example, in May 2009, after passing

21  the Housing and Economic Recovery Act, the Federal Housing Finance Board and Federal Housing

22  Finance Agency ("**FHFA**") published proposed rules to reflect CDFI membership in Federal Home

23  Loan Banks.  The proposed regulations promoted the benefits of CDFIs, noting that "CDFIs serve as

24  intermediary financial institutions that promote economic growth and stability in low and-moderate-

25  income communities."  Additionally, the proposed regulations highlighted the benefits of CDFIs as

26  members of Federal Home Loan Banks, explaining that CDFIs' "lending and community support

27  activities are thus consistent with the Banks' housing mission.  By stabilizing the communities in a

28  Bank's District, CDFIs can provide added value to that Bank as well as its members."

**FIRST AMENDED COMPLAINT**

14.     Given the importance the government has placed on CDFI membership within the Federal Home Loan Bank system, Congress has eliminated the banks' discretion to reject CDFIs for membership.  If a CDFI meets the technical requirements for membership, it must be accepted as a Federal Home Loan Bank member.  If a CDFI does not meet the technical requirements for bank membership, a Federal Home Loan Bank may still in its discretion accept a CDFI as a member in certain situations.  To that end, Federal Home Loan Banks may only consider whether an applicant has met the statutory requirements as outlined in 12 C.F.R. section 1263.2 or should be considered otherwise qualified for membership; they cannot deny an application for discretionary reasons.

15.     FHLB-SF is a member-owned cooperative wholesale bank and part of the Federal Home Loan Bank system.  FHLB-SF purports to promote housing, homeownership, and community economic development by linking its member financial institutions to worldwide capital markets.  It markets these claims on its website to potential members such as Commerce, and it explicitly claims its mission includes expanded access to capital for minority and low income populations.  FHLB-SF claims to provide access to low-cost funding that enables its members to achieve their financial objectives and meet the credit needs of their communities, and it touts its commitment to partnering with its members and community-based organizations to make communities more vibrant, equitable, and resilient.

16.     FHLB-SF has a troubled history that included red-lining and discriminatory practices that still have negative impacts on minority neighborhoods in California today.  The past practices of FHLB-SF and its predecessor entities are such that Commerce's governing Boards would not have permitted Commerce to seek membership in FHLB-SF if it continued its discriminatory practices.  As a CDFI with a primary mission of community development, Commerce explicitly shuns doing business with organizations that discriminate based on race.

17.     Based on representations FHLB-SF and its agents (at the behest of and with actual authority from FHLB-SF) made both publicly and privately, including specific in-person representations to Commerce's Officers and Board Members, Commerce firmly believed that FHLB-SF had implemented changes to address its past discriminatory practices and no longer sought to discriminate against minority and low income borrowers served by its members.  Based on that belief,

**FIRST AMENDED COMPLAINT**

1  and in an effort to meet its goal of expanding access to capital to creditworthy borrowers who are

2  underbanked, Commerce decided to apply for membership in FHLB-SF.

3          18.     On May 10, 2018, Commerce contacted FHLB-SF about becoming a member.  These

4  direct discussions with FHLB-SF followed several months of discussions with the Federal Housing

5  Finance Agency (which regulates the Federal Home Loan Bank system), including two in person

6  meetings with FHFA Director Melvin Watt and his team, about the licensing of Commerce as a CDFI

7  and its ability to achieve membership with the Federal Home Loan Bank system.

8          19.     Personnel from Commerce and FHLB-SF then had numerous conferences, meetings,

9  calls, and exchanges of information to discuss the application requirements and assemble the

10  documentation necessary to support Commerce's application to become a FHLB-SF member.  On

11  June 5, 2018, for example, Commerce participated in a call with John McCormack, Michael Roth,

12  and Reimund Sauer at FHLB-SF to discuss Commerce's membership application.  In November

13  2018, FHLB-SF also introduced Diane Jester, who was FHLB-SF's Vice President of Credit and

14  Collateral Services, to Martice Mills at Commerce to assist Commerce in understanding operational

15  and reporting procedures related to membership approval.  In addition, the detailed information

16  exchange included, among other things, Commerce's loan underwriting, Mortgage Servicing Rights

17  ("*MSR*"), Commerce's detailed financial statements, Commerce's management structure, and

18  Commerce's strategic and business plans.  Commerce provided this information in accordance with

19  FHLB-SF's direction and approval, and through the process, FHLB-SF learned the details of

20  Commerce's operations and fully understood why Commerce was seeking the benefits of membership

21  in FHLB-SF.  In fact, FHLB-SF assigned Commerce an "advocate" who would usher Commerce

22  through the process, provide Commerce technical assistance in preparing the application, and ensure

23  FHLB-SF received all of the information it needed in the desired format.

24          20.     Throughout the process, FHLB-SF appeared genuinely excited that Commerce was

25  applying for membership.  FHLB-SF, including its new and existing credit managers, regularly

26  contacted and even met with Commerce personnel, including Martice Mills, Faith Bautista, and

27  Steven Sugarman, to discuss Commerce's lending programs and to explore how Commerce could

28

**FIRST AMENDED COMPLAINT**

1    maximize its use of the bank's services, and in particular, its various programs including its Mortgage

2    Partnership Finance program.

3           21.    During the application process, FHLB-SF gave Commerce significant assistance and

4    guidance on how to structure and shape the submission package to ensure the application would

5    ultimately be approved.  For instance, FHLB-SF counseled Commerce to withdraw the application

6    for membership submitted by Commerce's CDFI holding company and, instead, limit the application

7    to Commerce itself.  FHLB-SF stated that this would streamline the process, because Commerce

8    appeared to clearly qualify on its own merit.

9           22.    In mid-December 2018, after Commerce spent millions of dollars in costs to become

10   a member, and FHLB-SF had spent more than seven months conducting an exhaustive review and

11   due diligence of Commerce's qualifications, FHLB-SF offered Commerce membership with the

12   bank.

13          23.    On or about December 18, 2018, FHLB-SF's Senior Vice President and Chief Risk

14   Officer, Lisa Violet, signed a written "Decision Resolution," through which FHLB-SF declared that

15   Commerce "is authorized under the laws of the United States and the laws of the State of California

16   to become a member of, purchase stock in, do business with, and maintain deposits in the Bank" and

17   that Commerce "meets all of the membership eligibility criteria . . . and qualifies for membership in

18   the Bank."  The Decision Resolution concludes that FHLB-SF "hereby approves Commerce Home

19   Mortgage, LLC's application for membership."

20          **B.    Commerce Meets Its Initial Stock Purchase Requirement**

21          24.    FHLB-SF requires members to provide capital to the bank by purchasing stock.  There

22   is no public market for that stock, as it is only held by approved members, and a member can only

23   sell it back to FHLB-SF if and when the organization terminates its relationship with the bank.

24          25.    Commerce is informed and believes and, on that basis, alleges that new members are

25   typically given at least sixty days to pay in their initial stock purchase funds.

26          26.    FHLB-SF did not treat Commerce the way it treated other new members, however.  In

27   the midst of the holiday season and just two days after Commerce became a member, on

28   December 21, 2018, FHLB-SF asked Commerce to immediately fund its stock purchase requirement.

**FIRST AMENDED COMPLAINT**

1  FHLB-SF explained to Commerce that it wanted the funding before year end to strengthen its balance

2  sheet.  FHLB-SF calculated that initial capital amount to be $450,000.

3      27.    As requested, Commerce funded the full $450,000, in cash, just three days later, on

4  Christmas Eve, December 24, 2018.  These funds came from capital that Commerce would have

5  otherwise used to lend to low-income and minority borrowers or to post with its private lenders (such

6  as its warehouse lenders) who would enable Commerce to lend a multiple of that capital to

7  underserved borrowers for loans originated for sale.  Commerce, however, agreed to the short time

8  period as requested by FHLB-SF, as Commerce believed any immediate impacts would be balanced

9  by the long-term benefit to its underbanked customers that FHLB-SH membership would have.

10     **C.     <u>Commerce Waits for, but Never Receives, the Benefits of Membership</u>**

11     28.    The primary purpose for Commerce's membership in FHLB-SF was to utilize FHLB-

12  SF's access to capital markets to support new lending to Commerce's customer base.  On the same

13  day that Commerce fulfilled its stock purchase requirement, FHLB-SF told Commerce it would

14  quickly get access to its facility in January 2019.

15     29.    That did not occur as promised.  As the days passed, FHLB-SF came up with numerous

16  excuses for why Commerce did not yet have its credit facility.  Sometimes FHLB-SF cited "internal

17  issues" for the delay.  Other times, FHLB-SF lamented that meetings during which the credit facility

18  was to be approved were accidentally missed or unexpectedly cancelled.

19     30.    Commerce believed progress was being made when, in January 2019, FHLB-SF sent

20  personnel to Commerce's offices to begin the "onboarding" process for the credit facilities.  However,

21  FHLB-SF did not complete the process at that time, and when Commerce inquired about the timing

22  for completion, FHLB-SF offered only more delays and various excuses.

23     31.    Hoping to finally realize the privileges of membership, Commerce continued to reach

24  out to FHLB-SF.  Commerce is overseen by a Community Advisory Board ("*CAB*") whose purpose

25  it is to ensure that Commerce's lending programs are non-predatory and prudent.  In January 2019,

26  two members of the CAB – Faith Bautista (the then-Chair of the CAB) and Reverend Everett Bell

27  (the current CAB Chair) – met with Greg Seibly, who at the time was FHLB-SF's President and Chief

28  Executive Officer.

**FIRST AMENDED COMPLAINT**

32.     During a candid, but troubling, discussion, Mr. Seibly stated that the executive team at FHLB-SF included a lot of "old school" bankers who did things in a "traditional" way and did not understand CDFIs such as Commerce.  Mr. Seibly explained that he was working hard to "change" the existing culture and to help his team change their mindset about CDFIs, as some FHLB-SF personnel believed that CDFIs were risky because they served minority and low-income borrowers.

33.     During the meeting, Mr. Seibly told Ms. Bautista and Reverend Bell that FHLB-SF was going through a regulatory audit, and that he "needed 60 days to get past it" before he could even begin to consider making changes relating to how FHLB-SF viewed and treated CDFIs.  Mr. Seibly did not, however, elaborate on why he believed the audit stood in the way of his ability to serve CDFIs like Commerce consistent with FHLB-SF's statutory mandate.  He likewise did not elaborate on why the audit would somehow be seemingly negatively impacted by the lending to minorities and lower income borrowers.

34.     During the meeting, Mr. Seibly sought to explain why it would take time to "reform" FHLB-SF and its poor racial practices by citing the book *The Color of Law*, which discusses the long-term impact of systemic racism and the fact that its pernicious impact can create racial inequality for decades even after explicit racial discrimination subsides.  Ms. Bautista and Reverend Bell reported this conversation to a shocked Community Advisory Board and management team at Commerce, who could not believe the President of FHLB-SF was attempting to justify on-going structural racial inequalities within the organization he was responsible for overseeing.  Shortly after the meeting, Mr. Seibly sent Ms. Bautista a copy of *The Color of Law*, as if to taunt Commerce's community leaders with the fact that FHLB-SF was well aware of the ongoing and lingering racial inequalities that persisted within the organization.

35.     When Ms. Bautista and Reverend Bell inquired about the timing for Commerce's credit facility, Mr. Seibly told them it would take some more time.  Mr. Seibly asked to meet again in six (6) weeks (*i.e.*, at the end of February 2019), indicating that he believed it would take that long for Commerce to be granted basic credit facilities and FHLB-SF services, even though Commerce was already a member and had already paid several hundreds of thousands of dollars to FHLB-SF to secure membership.

**FIRST AMENDED COMPLAINT**

36.    Commerce remained in close contact with FHLB-SF in early February 2019, and FHLB-SF continued to attempt to explain away Commerce's concerns about the delays in opening the credit facility.  For example, FHLB-SF's John McCormack told Martice Mills that FHLB-SF is not looking to have a member in name only to whom the bank does not extend any credit. Mr. McCormack again promised that the credit facility would soon be available to Commerce. Mr. McCormack then related a series of messages noting the date Commerce should expect to receive credit approval, and then when each date passed without approval, more excuses as to why Commerce did not receive its financing as promised.  In one particularly telling example in early 2019, Mr. McCormack explained that Commerce did not receive credit approval at a planned meeting, because the executive team decided to host a retirement party for an employee instead of convening the meeting to approve Commerce's credit as planned.  Mr. McCormack told Commerce not to worry and promised that the committee would convene a few days later.  Suffice to say, each of Mr. McCormack's assurances, while comforting to Commerce at the time, ultimately proved false and to be attempts to hide from Commerce the truth about FHLB-SF.

37.    Though Commerce remained hopeful that FHLB-SF would meet its obligations, Commerce received a dose of disappointment in late February 2019.  Pursuant to Mr. Seibly's invitation to circle back in six weeks, the CAB wrote to Mr. Seibly on February 21, 2019 to try to arrange another meeting to evaluate the progress made relating to Commerce at FHLB-SF and to evaluate how best Commerce could utilize the services all members of FHLB-SF were entitled.

38.    In that February 21, 2019 letter, Commerce noted, among other things, that FHLB-SF had not yet approved Commerce for even one dollar of financing, had not yet approved Commerce for its mortgage "gain on sale" program, had not yet approved Commerce to have FHLB-SF hold Commerce's physical collateral at FHLB-SF's designated custodians, had not yet approved Commerce for the Mortgage Partnership Finance program, and had not yet considered Commerce for FHLB-SF's program for community development whereby FHLB-SF purchased "community development loans" from its members to meet its regulatorily required community development goals.

///

**FIRST AMENDED COMPLAINT**

39.     Contrary to his earlier statements, Mr. Seibly did not accept the CAB's invitation to meet.  Instead, in a letter dated February 28, 2019, Mr. Seibly responded by expressing his "delight" that Commerce had become a FHLB-SF member.  Concurrently, Mr. Seibly sent word from FHLB-SF that Commerce and its Community Advisory Board's continued engagement and advocacy with FHLB-SF was "not helpful" to Commerce's membership objectives.

40.     Though professional in tone, Mr. Seibly's February 28, 2019 letter included extremely troubling statements.  Among other things, it disclosed that FHLB-SF judged and evaluated CDFIs differently from other bank members due to, among other things, "the types of collateral being pledged" by CDFIs.

41.     The only difference in the collateral being pledged, however, is that such collateral is being pledged by a more diverse race and ethnicity than that which FHLB-SF had maintained historically.  Among other things, Commerce is engaged in first deed of trust single family residential lending.  Commerce's team is the identical team that originated identical loans at Banc of California and pledged over $1,000,000,000 to FHLB-SF consistently.  Over ninety percent of Commerce's loans were conventional Fannie Mae, Freddie Mac, Federal Housing Administration, Department of Veterans Affairs, and Department of Agriculture loans, which are identical to all loans originated across the country for these programs and which represent approximately $1,500,000,000,000 in lending a year.

42.     In fact, and based on its prior investigation of Commerce's operations during the application process, FHLB-SF knew that Commerce used standard desktop underwriting for these loans and there was nothing "unique" about them, other than the fact that Commerce banked Black, Latino/Hispanic, and low income borrowers in higher percentages than FHLB-SF's other members.  Commerce's other loans are primarily loans sold to Chase Bank, Wells Fargo Bank, Flagstar Bank, and other members of the Federal Home Loan Bank system, who FHLB-SF allows to then pledge the loans.  Thus, the only difference in the "types of collateral" with respect to Commerce is the makeup of Commerce's customers, and in particular, that Commerce's borrowers are more likely to be African-American, Latino/Hispanic, and minority borrowers, and the "old-school" bankers at FHLB-SF are less comfortable lending to those groups.  Such a distinction is beyond troubling.

**FIRST AMENDED COMPLAINT**

43.     It is also significant that Mr. Seibly's February 28, 2019 letter did not mention, and completely ignored, the CAB's request to set up a meeting.  Disturbingly, Commerce was later advised by counsel to FHLB-SF, as well as its banker and others at FHLB-SF, that advocacy efforts by Commerce's CAB members were "not productive" and would harm Commerce's standing as a FHLB-SF member, despite the fact that Commerce's Community Advisory Board had (and has) a statutory duty to act as representatives of Commerce's underserved communities.

**D.     FHLB-SF Demands Another Capital Infusion from Commerce**

44.     On or about April 22, 2019, FHLB-SF advised Commerce that despite delays in opening the credit facility, Commerce had to keep up with its capital requirements in order to stay in good standing with the bank's membership requirements.  FHLB-SF demanded that Commerce immediately purchase an additional $643,000 of FHLB-SF stock, purportedly due to an increase in Commerce's assets as of December 31, 2018.  Based on its anticipation that FHLB-SF would provide the long-promised credit facility and access to FHLB-SF's other services, the very next day, on April 23, 2019, Commerce wired $643,300 to FHLB-SF, thus increasing Commerce's capital outlays to a total of $1,093,300.

45.     In sharp contrast to the speed at which Commerce acceded to FHLB-SF's demand for an additional capital contribution, FHLB-SF continued to delay extending Commerce any credit, or for that matter, any services at all.

46.     Throughout the spring and summer of 2019, FHLB-SF continued to push off Commerce's request for its credit facility.  At the same time, FHLB-SF was instructing Commerce to regularly provide FHLB-SF with updates of Commerce's financial documentation.  It was very costly for Commerce to prepare and produce this information to FHLB-SF on an increasingly frequent basis.  However, Commerce did so, again in anticipation that Commerce would soon begin to enjoy the same benefits as its fellow members.  Unfortunately for Commerce, that never happened.

**E.     FHLB-SF Abruptly Terminates Commerce's Membership**

47.     In a letter dated September 20, 2019, FHLB-SF informed Commerce that FHLB-SF had rescinded its prior approval of Commerce's membership and, to that end, deemed Commerce's membership in FHLB-SF to be null and void.  In support, the letter attached correspondence from the

1   FHFA in which the FHFA rubberstamped the FHLB-SF's purported determination that Commerce

2   had not satisfied the operating liquidity ratio requirement when it applied for membership.

3          48.     Prior to FHLB-SF's asserted rescission of Commerce's membership, Commerce had

4   been explicitly told to calculate its liquidity as it did when Commerce originally applied for FHLB-

5   SF membership.  Then, when Joseph Otting became the Acting Director of the FHFA, it was reiterated

6   to Commerce that there were no concerns with Commerce's membership or financials.

7          49.     The reasoning set forth in the letter was a plain pretext to eject Commerce as a member

8   of FHLB-SF.  Among other things, Commerce's financial condition had not adversely changed from

9   when it was initially approved for FHLB-SF membership and, in fact, had strengthened.  As such,

10  there was no basis or need for the FHLB-SF to even question Commerce's eligibility for membership

11  in the first instance and, to that end, the FHLB-SF's later determination and reasoning for rescission

12  of Commerce's membership was pure pretext.

13         50.     Commerce is informed and believes and, on that basis, alleges that FHLB-SF's claim

14  to have rescinded Commerce's membership is unprecedented.  FHLB-SF did not cite any regulatory

15  or statutory guidance empowering FHLB-SF to rescind a member's membership for reasons other

16  than safety and soundness, or to reverse the interpretation of an FHFA policy.  Also, Commerce is

17  unaware of any time in the history of FHLB-SF that it has sought to retroactively rescind the

18  membership acceptance of any member that serves primarily White consumers.

19         51.     In addition, FHLB-SF's decision to rescind Commerce's membership was in breach

20  of various agreements it had with Commerce, including the Advances and Security Agreement (the

21  "*Agreement*").  On August 29, 2018, and as part of the application process, Commerce executed the

22  Agreement, which controlled not only the terms under which FHLB-SF would fund and secure

23  extensions of credit, but also set forth, under Section VII (A), the events of default and remedies under

24  the Agreement.   A true and correct copy of the Agreement is attached to this Complaint as

25  "Exhibit A."

26         52.     Section VII (A) of the Agreement provides, in pertinent part, that a default occurs that

27  "terminate[s] any obligation on the part of the Bank in respect of any Commitment" when under

28  Section VII (A)(12) "[t]he Bank reasonably and in good faith determines that a material adverse

**FIRST AMENDED COMPLAINT**

1  change has occurred in the financial condition of the Member or in the Collateral from that disclosed

2  previously to the Bank."

3      53.   At the time FHLB-SF purported to rescind Commerce's membership, Commerce's

4  earnings, liquidity, assets, capital, and originations were stronger, higher, and more robust than at the

5  time FHLB-SF first approved Commerce's membership, and therefore FHLB-SF had no reasonable

6  basis to allege any material adverse change had occurred.  Further, Commerce had no material

7  collateral impairments or loan losses, and again, FHLB-SF had no reasonable basis to allege a

8  deterioration in Commerce's collateral conditions.  In fact, at the time FHLB-SF purported to rescind

9  Commerce's membership, Commerce was in an even stronger financial position than at the time of

10  its application.  Commerce was not only (even more) credit worthy, but was Investment Grade, with

11  an "A" rating, and the largest non-bank CDFI originator in the nation.  As set forth herein, it is this

12  latter point for which FHLB-SF ultimately rescinded Commerce's membership.

13      54.   To that end, Commerce is informed and believes and, on that basis, alleges that when

14  FHLB-SF rescinded its prior of approval of Commerce's membership, it did so without any

15  reasonable or legal basis to do so, and in fact acted in bad faith, because it was hostile to CDFIs like

16  Commerce who lend to traditionally Black, Hispanic, and low income customers.

17      **F.**   **Commerce Re-Applies for FHLB-SF Membership**

18      55.   Frustrated, but undeterred by FHLB-SF's past conduct, and recognizing that

19  membership in FHLB-SF was important to allow Commerce to better serve its customers, Commerce

20  reapplied for membership in January 2020.  That process was burdensome, costly, and harmful to

21  Commerce.  However, because Commerce had further strengthened its already strong balance sheet

22  in later 2019 and 2020, Commerce believed it would quickly attain readmittance and FHLB-SF had

23  no valid reason to deny Commerce membership. As noted above, by the time that FHLB-SF had

24  wrongfully purported to rescind Commerce's membership, Commerce was even more credit worthy,

25  was Investment Grade, had an "A" rating, and was the largest non-bank CDFI originator in the nation.

26      56.   Despite numerous discussions and the provision of additional information by

27  Commerce at FHLB-SF's request, on May 29, 2020, FHLB-SF sent Commerce a letter (signed by

28  the very individual who former FHLB-SF President Greg Seibly warned was hostile to CDFIs like

1  Commerce) informing Commerce that FHLB-SF did not believe that Commerce met the liquidity test

2  set forth in Section 1263.16(b)(2)(iv).

3      57.    After receiving FHLB-SF's May 29, 2020 denial, Commerce availed itself of, and

4  exhausted, its administrative appeals, without success.

5      58.    With the benefit of hindsight, Commerce now realizes FHLB-SF never wanted

6  Commerce as a "member" of FHLB-SF, but was merely interested in Commerce as a pawn to bolster

7  the total number of CDFI members without increasing financing to CDFIs or to minority borrowers.

8  To that end, FHLB-SF convinced Commerce to pay it $1,093,300 and used Commerce as a prop to

9  promote the notion that FHLB-SF included organizations that catered to minority communities, all

10  the while, giving Commerce *none* of the benefits of membership in the bank.

11  **<u>FIRST CAUSE OF ACTION</u>**

12  (For Fraud against All Defendants)

13      59.    Commerce incorporates and realleges the allegations of Paragraphs 1 through 58 of

14  this Complaint by reference, as though set forth at length.

15      60.    As alleged above, FHLB-SF encouraged Commerce to apply for membership in the

16  bank, going so far as to affirmatively assist Commerce in the months-long application and due

17  diligence process.  FHLB-SF then made numerous statements to Commerce that FHLB-SF had

18  accepted Commerce as a bank member.

19      61.    As alleged in Paragraph 23, above, FHLB-SF stated in writing that Commerce "is

20  authorized under the laws of the United States and the laws of the State of California to become a

21  member of, purchase stock in, do business with, and maintain deposits in the Bank," that Commerce

22  "meets all of the membership eligibility criteria . . . and qualifies for membership in the Bank," and

23  that FHLB-SF "hereby approves Commerce Home Mortgage, LLC's application for membership."

24      62.    Later, FHLB-SF confirmed Commerce's standing as a member of the bank in

25  numerous other communications with Commerce.  For example, in a February 28, 2019, letter from

26  FHLB-SF's President and Chief Executive Officer, Greg Seibly, addressed to members of

27  Commerce's Community Advisory Board, FHLB-SF stated that Commerce "was approved for

28  membership in the Bank on December 19, 2018."

15

**FIRST AMENDED COMPLAINT**

63.     FHLB-SF intended to use, and did use, statements about Commerce's membership and the promise of membership benefits in order to induce Commerce to make monetary payments to FHLB-SF for membership.   Commerce actually and justifiably relied on those statements and promises when making payments to FHLB-SF and complying with the other demands FHLB-SF made to Commerce, such as ongoing, burdensome financial reporting.

64.     As alleged in more detail in Paragraphs 27 and 44, above, Commerce did, in fact, make all of the membership payments FHLB-SF demanded.   Initially, Commerce paid FHLB-SF $450,000 on or about December 24, 2018, which was the amount purportedly due under FHLB-SF's calculation guidelines for members.   Later, when FHLB-SF demanded more money around April 22, 2019, Commerce paid FHLB-SF an additional $623,300.   Commerce also acceded to all of FHLB-SF's other demands and terms of membership.

65.     Commerce is informed and believes and, on that basis, alleges that FHLB-SF retained full control over and use of the monies Commerce paid throughout the time Commerce was purportedly a member of the bank.

66.     Commerce is informed and believes and, on that basis, alleges that, at the time FHLB-SF made its statements and promises about Commerce's membership, they were false.   FHLB-SF's statements and promises were merely a premise for FHLB-SF to convince Commerce to pay FHLB-SF the money FHLB-SF demanded.

67.     Later statements made by FHLB-SF demonstrate that the bank never intended to extend Commerce the same benefits it provides its other member organizations.   For example, in or about January 2019, when FHLB-SF's President and Chief Executive Officer, Greg Seibly, met with the chairs of Commerce's Community Advisory Board, Reverend Everett Bell and Faith Bautista, Mr. Seibly disclosed that FHLB-SF did not understand CDFIs like Commerce who served minority communities and did not like Commerce's business model.   Mr. Seibly conveyed that Commerce would not be treated as a member of the bank until Mr. Seibly could educate others at FHLB-SF about providing equal access to credit for lenders to minority borrowers.

68.     Despite its claims that Commerce had become a member of the bank, FLHB-SF never allowed Commerce to use any of the benefits of membership.   Importantly, FHLB-SF never allowed

Commerce to actually do business with the bank – through advances or loans that would have assisted Commerce in providing mortgages or other financial products to its customers – and FHLB-SF did not allow Commerce to make deposits or allow Commerce to provide physical capital to FHLB-SF's designated custodians. While FHLB-SF may have had discretion as to whether to allow Commerce to do business with the bank and initially deny Commerce's membership application, FHLB-SF's refusal to later allow Commerce to enjoy any of the privileges of membership after Commerce's membership was approved evidences the pre-textual nature of FHLB-SF's initial decision to admit Commerce as a member.

69.     In or about September 2019, FHLB-SF suddenly, and without warning, terminated Commerce's membership, claiming that Commerce did not meet the financial standards for membership in the bank.  Such a pretext was unbelievable on its face, when, in fact, FHLB-SF had previously conducted a months-long application and due diligence process to fully explore Commerce's operations, business and financial soundness.

70.     FHLB-SF's fraudulent conduct has actually and proximately caused harm to Commerce.  Among other things, Commerce suffered damages by way of the lost revenues from Commerce's inability to use the capital it was fraudulently induced to pay to FHLB-SF for lending to borrowers.  Commerce's return on equity during the period was much higher than the returns from the capital paid to FHLB-SF to secure the benefits that never came.  Commerce incurred substantial costs for having to comply with its membership obligations and also sustained reputational harm as a result of having had its membership rescinded.

71.     At this time, Commerce has not been able to fully quantify its damages, but Commerce is informed and believes and, on that basis, alleges that they exceed the jurisdictional minimum of this Court.

72.     In addition to its actual damages, Commerce is entitled to an award of punitive damages pursuant to California Civil Code section 3294, as FHLB-SF's conduct was fraudulent.

///

///

///

**FIRST AMENDED COMPLAINT**

## SECOND CAUSE OF ACTION

(For Violations of California Business & Professions Code section 17200, *et seq.*

against All Defendants)

73.     Commerce incorporates and realleges the allegations of Paragraphs 1 through 58 of this Complaint, as though set forth at length.

74.     FHLB-SF's conduct, as alleged above, constitutes fraudulent business practices that violate California Business and Professions Code section 17200, *et seq.*

75.     Among other things, FHLB-SF employed a fraudulent scheme to compel Commerce to pay nearly $1,100,000 to the bank, while never extending any membership benefits to Commerce. FHLB-SF also discriminated against Commerce who, as a CDFI, lends to minorities and other underserved communities.  When FHLB-SF had nothing more to gain from feigning Commerce's membership in the bank, FHLB-SF proceeded to use a pretextual reason to rescind Commerce's membership, even though Commerce had met the qualifications for membership under governing regulations.

76.     Commerce is entitled to appropriate injunctive relief to prevent FHLB-SF from harming Commerce with these types of fraudulent business practices in the future.

## THIRD CAUSE OF ACTION

(For Breach of Contract against All Defendants)

77.     Commerce incorporates and realleges the allegations of Paragraphs 1 through 58 of this Complaint, as though set forth at length.

78.     On or about August 29, 2018, Commerce and FHLB-SF entered into the written Advances and Security Agreement.

79.     Commerce performed all of its obligations under the Agreement, including paying capital to FHLB-SF in the aggregate amount of $1,093,300.

80.     Pursuant to the plain language of Section VII (A)(12) of the Agreement, FHLB-SF's actions in rescinding Commerce's membership were a breach of the Agreement, as, among other things, there was no material adverse change in Commerce's financial condition or its collateral.

///

18

**FIRST AMENDED COMPLAINT**

81.     As a result of this breach, Commerce has been damaged.    Among other things, Commerce suffered damages by way of the lost revenues from Commerce's inability to use the capital it was fraudulently induced to pay to FHLB-SF for lending to borrowers.  Commerce's return on equity during the period was much higher than the returns from the capital paid to FHLB-SF to secure the benefits that never came.  Commerce incurred substantial costs for having to comply with its membership obligations and also sustained reputational harm as a result of having had its membership rescinded.

82.     At this time, Commerce has not been able to fully quantify its damages, but Commerce is informed and believes and, on that basis, alleges that they exceed the jurisdictional minimum of this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Commerce Home Mortgage, LLC prays for relief against the Defendants to this action as follows:

A.     On the First Cause of Action, for monetary damages in an amount to be proven at trial;

B.     On the First Cause of Action, for prejudgment interest as allowed by law;

C.     On the First Cause of Action, for an award of punitive damages;

D.     On the Second Cause of Action, for injunctive relief prohibiting Federal Home Loan Bank of San Francisco, when considering any future application by Commerce Home Mortgage, LLC or other applicants for membership, from making any false representations as to the benefits of membership that will be received if accepted as a member into the Federal Home Loan Bank of San Francisco.

E.     On the Third Cause of Action, for monetary damages in an amount to be proven at trial;

F.     On the Third Cause of Action, for prejudgment interest as allowed by law;

G.     On all causes of action, for costs of suit; and

///

///

**FIRST AMENDED COMPLAINT**

H.     On all causes of action, for any and all such other relief as the Court may deem just and proper.

**MICHELMAN & ROBINSON, LLP**

Dated:  June 8, 2021                                   By:  _____

Timothy J. Gorry
Jon-Jamison Hill
Vincent Loh
Attorneys for Plaintiff,
Commerce Home Mortgage, LLC

20

**FIRST AMENDED COMPLAINT**

EXHIBIT A

 **FHLBank San Francisco**

**Advances and Security Agreement
Community Development Financial Institutions**

This Advances and Security Agreement ("Agreement") is made as of ___August 29, 2018___
between the Federal Home Loan Bank of San Francisco ("Bank") and ___Commerce Home Mortgage, LLC___
_____ ("Member"), which has its main, home, or principal
office at ___3130 Crow Canyon Place, Suite 400, San Ramon, California, 94583___

**WHEREAS**, the Member may apply from time to time for extensions of credit from the Bank in accordance with the terms and conditions of this Agreement; and

**WHEREAS**, the Bank requires that all indebtedness of the Member to the Bank and all extensions of credit by the Bank to the Member pursuant to this Agreement be secured pursuant to this Agreement and in accordance with applicable laws, regulations, and policies, and the Member is willing to provide such security;

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Member and the Bank agree as follows:

**I.      Definitions**

The following terms have the following meanings in this Agreement:

**A.      "Act"** means the Federal Home Loan Bank Act, as amended, modified, or supplemented from time to time.

**B.      "Advance"** or **"Advances"** means any and all loans and other extensions of credit made by the Bank to the Member, including, without limitation, all payments made by the Bank on behalf of or for the account of the Member under outstanding Commitments and all loans and other extensions of credit made by the Bank to the Member prior to the date of this Agreement.

**C.      "Bank's Credit Program"** means the credit program established by the Bank as it is described in the Bank's "Credit Guide" and "Collateral Guide," each as amended, modified, or supplemented from time to time.

**D.      "Borrowing Capacity"** means the aggregate dollar amount assigned by the Bank, in its sole discretion, to the Member's Collateral for purposes of determining the Member's compliance with the Collateral maintenance obligations of Section IV.A. The Bank may calculate and change the Borrowing Capacity of the Member's Collateral, at any time and for any reason including, but not limited to, the Bank's assessment of the Member's creditworthiness.

**E.      "Capital Stock"** means all of the capital stock of the Bank owned by the Member and all dividends and proceeds of such capital stock.

**F.      "CDFI"** means a "community development financial institution" as defined in Section 1263.1 of the Regulations, and that meets the criteria established by the Bank from time to time.

**G.      "CDFI Act"** means the Community Development Banking and Financial Institutions Act of 1994, as amended, modified, or supplemented from time to time.

**H.      "CDFI Fund"** means the "CDFI Fund" of the U.S. Treasury Department established under Section 104(a) of the CDFI Act, which provides CDFI certification and financial support to CDFIs.

**I.      "Collateral"** means all property, including the proceeds and products thereof, at any time pledged to the Bank by the Member as security for Indebtedness, including, without limitation, all Loan Collateral, Securities Collateral, Other Collateral, Deposit Accounts, and Capital Stock pledged to the Bank pursuant to Section III.A. or otherwise.

**J.      "Collateral Confirmation"** means a writing or electronic transmission from the Bank to the Member or a report or other information posted on the Bank's member website confirming the contents of a Collateral Update Report.

**K.      "Collateral Guide"** means the Bank's Collateral Guide, as amended, modified, or supplemented from time to time.

**L.      "Collateral Maintenance Level"** means the product of (1) the dollar sum of the Member's (a) outstanding Advances, (b) outstanding Commitments, and (c) any additional Indebtedness of the Member to the Bank, and (2) the percentage specified by the Bank from time to time and which the Bank, in its sole discretion, may increase or decrease at any time and for any reason including, but not limited to, the Bank's assessment of the Member's creditworthiness. In accordance with Section IV.A., the Member must at all times pledge

Eligible Collateral with an aggregate Borrowing Capacity at least equal to the Member's then current Collateral Maintenance Level.

**M.** **"Collateral Update Report"** means a schedule, embodied on the media and in the form required by the Bank from time to time, specifying and describing certain Eligible Collateral pledged by the Member to the Bank as of the date of the schedule.

**N.** **"Commercial Loan"** means a whole mortgage loan made for commercial, corporate, or business purposes and secured by a lien on real property that is not a dwelling unit or is not used for residential purposes and the parcel(s) of real estate on which it is located. A Multifamily Loan is not a Commercial Loan.

**O.** **"Commercial Loan Collateral"** means with respect to each Commercial Loan that is pledged by the Member to the Bank pursuant to Section III.A. or otherwise, the promissory note, bond, or other instrument that evidences the Commercial Loan; any related mortgage or deed of trust that secures the Commercial Loan; any endorsements or assignments thereof to the Member; all ancillary security agreements, policies, and certificates of insurance or guarantees, evidences of recordation, applications, underwriting materials, appraisals, approvals, permits, notices, opinions of counsel, loan servicing rights (if not otherwise pledged, sold, or conveyed to another party), loan servicing data and agreements; all other electronically stored and written records or materials relating to the Commercial Loan; and all proceeds and products of the Commercial Loan.

**P.** **"Commitments"** means any and all agreements under which the Bank is obligated to make Advances to the Member or payments on behalf of or for the account of the Member, existing on or after the date of this Agreement, including, without limitation, letters of credit, firm commitments, guarantees, or other arrangements intended to facilitate transactions between the Member and third parties, and irrespective of whether the Bank's obligation under any applicable agreement is contingent upon the occurrence or nonoccurrence of a condition subsequent.

**Q.** **"Confirmation"** means a writing or electronic transmission from the Bank to the Member confirming the terms and conditions upon which the Bank and the Member have agreed with respect to an Advance or Commitment.

**R.** **"Credit Guide"** means the Bank's Credit Guide, as amended, modified, or supplemented from time to time.

**S.** **"Deposit Account"** means a demand, time, term, savings, transaction, or similar account with the Bank that is established by the Member or the Bank for the benefit, or in the name, of the Member.

**T.** **"Eligible Collateral"** means Collateral, other than Deposit Accounts and Capital Stock, that at the time it becomes Collateral and at all times thereafter (1) qualifies as security for the origination, issuance, or renewal of any Advance, Commitment, or other Indebtedness under the terms and conditions of the Act and the Regulations, (2) satisfies the requirements established by the Bank pursuant to the Bank's Credit Program or otherwise as specified in this Agreement or other writing, (3) is owned by the Member free and clear of any liens, encumbrances, or other interests other than the security interest granted to the Bank hereunder, and (4) in the case of Other Collateral and Securities Collateral, has been pledged by the Member to the Bank as Eligible Collateral pursuant to Section III.A. or otherwise.

**U.** **"Finance Agency"** means the Federal Housing Finance Agency or any successor agency thereto.

**V.** **"Government and Agency Securities Collateral"** means securities (including participation certificates) or other obligations issued, insured, or guaranteed by the United States Government or any agency thereof, including, without limitation, mortgage-backed securities issued or guaranteed by Freddie Mac, Fannie Mae, Ginnie Mae, or any other agency of the United States; and securities backed by, or representing an equity interest in, Government Loans.

**W.** **"Government Loan"** means a whole mortgage or other loan, regardless of delinquency status, to the extent the loan is insured or guaranteed by the United States or any agency thereof, or is otherwise backed by the full faith and credit of the United States, and such insurance, guarantee, or other backing is for the direct benefit of the holder of the loan.

**X.** **"Government Loan Collateral"** means, with respect to each Government Loan that is pledged by the Member to the Bank pursuant to Section III.A. or otherwise, the certificate of insurance or guarantee or other evidence of insurance, guarantee, or other backing by the United States or any agency thereof; all electronically stored and written records or materials relating to the Government Loan as required by the Bank from time to time (which may include the promissory note, bond, or other instrument that evidences the Government Loan; any related mortgage or deed of trust that secures the Government Loan; any endorsements or assignments thereof to the Member; any related certificates of deposit, stocks, bonds, certificates of title, notices, acknowledgments, control agreements, and other similar certificates, documents,

and agreements that secure the Government Loan and represent a lien on certain personal property; and all ancillary security agreements, policies, certificates of insurance, or guarantees, evidences of recordation, applications, underwriting materials, appraisals, approvals, permits, notices, opinions of counsel, and loan servicing rights [if not otherwise pledged, sold, or conveyed to another party], loan servicing data and agreements); and all proceeds and products of the Government Loan.

Y.   **"Indebtedness"** means all indebtedness of the Member to the Bank, whether now outstanding or incurred after the date of this Agreement, and whether real, contingent, or conditional, including, without limitation, all Advances, any other sums owed by the Member to the Bank pursuant to any provision of this Agreement or any other agreement between the Member and the Bank, all obligations of the Member to provide credit enhancements to the Bank, and all other obligations and liabilities of the Member to the Bank.

Z.   **"Loan Collateral"** means all loans secured by a lien on real property; all loans made for commercial, corporate, and business purposes; and all participation interests in such loans that are pledged by the Member to the Bank pursuant to Section III.A. or otherwise. With respect to each loan pledged to the Bank, Loan Collateral includes, without limitation, the promissory note, bond, or other instrument that evidences the loan; any related mortgage or deed of trust that secures the loan; any endorsements or assignments thereof to the Member; any related certificates of deposit, stocks, bonds, certificates of title, notices, acknowledgments, control agreements and other similar certificates, documents, and agreements that secure the loan and represent a lien on certain personal property; all ancillary security agreements, policies, and certificates of insurance or guarantees, evidences of recordation, applications, underwriting materials, appraisals, approvals, permits, notices, opinions of counsel, loan servicing rights (if not otherwise pledged, sold, or conveyed to another party), loan servicing data and agreements; all other electronically stored and written records or materials relating to the loan; and all proceeds and products of the loan. Loan Collateral includes, without limitation, Residential Loan Collateral, Multifamily Loan Collateral, Commercial Loan Collateral, Government Loan Collateral, Participation Collateral, and any other loans and participation interests that are pledged by the Member to the Bank and accepted as Loan Collateral by the Bank.

AA.   **"Multifamily Loan"** means a whole mortgage loan secured by a lien on a multifamily residential dwelling of five or more units and the parcel(s) of real estate on which it is located.

BB.   **"Multifamily Loan Collateral"** means, with respect to each Multifamily Loan that is pledged by the Member to the Bank pursuant to Section III.A. or otherwise, the promissory note, bond, or other instrument that evidences the Multifamily Loan; any related mortgage or deed of trust that secures the Multifamily Loan; any endorsements or assignments thereof to the Member; all ancillary security agreements, policies, and certificates of insurance or guarantees, evidences of recordation, applications, underwriting materials, appraisals, approvals, permits, notices, opinions of counsel, loan servicing rights (if not otherwise pledged, sold, or conveyed to another party), loan servicing data and agreements; all other electronically stored and written records or materials relating to the Multifamily Loan; and all proceeds and products of the Multifamily Loan.

CC.   **"Net Assets"** means the residual value of the Member's assets over liabilities, based on information derived from the Member's most recent financial statements provided to the Bank.

DD.   **"Other Collateral"** means items of property, other than Capital Stock, Deposit Accounts, Loan Collateral, and Securities Collateral, that are pledged by the Member to the Bank pursuant to Section III.A. or otherwise as Collateral for Indebtedness, and all proceeds and products thereof.

EE.   **"Other Securities Collateral"** means securities (other than Government and Agency Securities Collateral and Private Securities Collateral) that are pledged by the Member to the Bank pursuant to Section III.A. or otherwise as Collateral for Indebtedness, and all proceeds and products thereof.

FF.   **"Participation"** means an undivided participation or fractional interest in a Residential Loan, Multifamily Loan, Commercial Loan, or any other loan. A Participation is "retained" where the Member owns the whole loan and has sold or conveyed a participation or fractional interest in the loan, and "purchased" where the Member purchases a participation or fractional interest in the loan from another entity.

GG.   **"Participation Collateral"** means, with respect to each Participation that is pledged by the Member to the Bank pursuant to Section III.A. or otherwise, the related participation agreement or other similar agreement or document governing the Participation; all ancillary security agreements, policies, and certificates of insurance or guarantees, evidences of recordation, applications, underwriting materials, appraisals, approvals, permits, notices, opinions of counsel, loan servicing rights (if not otherwise pledged, sold, or conveyed to another party), loan servicing data and agreements; all other electronically stored and written records or materials relating to the Participation; and all proceeds and products of the Participation. With respect to a purchased

Participation, Participation Collateral may also include the participation certificate or other instrument or document that evidences the Member's Participation.

**HH.** **"Private Securities Collateral"** means privately issued securities representing unsubordinated interests in, or collateralized by first priority security interests in, both the interest and principal payments on fully disbursed whole first lien residential mortgage loans.

**II.** **"Regulations"** means the regulations of the Finance Agency, as amended, modified, or supplemented from time to time.

**JJ.** **"Residential Loan"** means a whole residential mortgage loan secured by a lien on a one- to four-unit residential dwelling and the parcel(s) of real estate on which it is located.

**KK.** **"Residential Loan Collateral"** means, with respect to each Residential Loan that is pledged by the Member to the Bank pursuant to Section III.A. or otherwise, the promissory note, bond, or other instrument that evidences the Residential Loan; any related mortgage or deed of trust that secures the Residential Loan; any endorsements or assignments thereof to the Member; all ancillary security agreements, policies, and certificates of insurance or guarantees, evidences of recordation, applications, underwriting materials, appraisals, approvals, permits, notices, opinions of counsel, loan servicing rights (if not otherwise pledged, sold, or conveyed to another party), loan servicing data and agreements; all other electronically stored and written records or materials relating to the Residential Loan; and all proceeds and products of the Residential Loan.

**LL.** **"Securities Collateral"** means Government and Agency Securities Collateral, Private Securities Collateral, and Other Securities Collateral that are pledged by the Member to the Bank pursuant to Section III.A. or otherwise, and all proceeds and products thereof.

**MM.** **"Solvent"** means (i) having total assets in excess of total liabilities (with assets and liabilities determined in accordance with Generally Accepted Accounting Principles or Generally Accepted Auditing Standards or Generally Accepted Government Auditing Standards, as applicable) and (ii) having the ability to pay one's debts as they become due.

## II. Advances Agreement

### A. Application and Procedures for Advances

From time to time, the Member may apply to the Bank for Advances or Commitments in accordance with the procedures established by the Bank from time to time. Each Advance or Commitment will be evidenced by a Confirmation. Each Advance or Commitment will be governed by the terms of this Agreement, the Bank's Credit Program, the related Confirmation, and any other writing applicable thereto. Unless otherwise agreed to in writing by the Bank, each Advance will be made by crediting the Member's Deposit Account specified by the Bank. The Bank's obligation to fund any Commitment will be subject to compliance by the Member with the terms and provisions of this Agreement, including, without limitation, the Collateral maintenance requirements set forth in Section IV.A. and satisfaction by the Member of the applicable credit considerations and other eligibility requirements and policies described in the Bank's Credit Program. If the Member's access to Advances is subsequently restricted pursuant to any provision of law or regulatory action, the Bank will not be required to fund any outstanding Commitments for Advances not funded prior to the effective date of the restriction. The Member will sign and deliver to the Bank a promissory note or notes in such form as the Bank may require to evidence any Advance.

### B. Repayment of Advances

The Member agrees to repay each Advance or any other amount due in accordance with this Agreement and the applicable terms and provisions of the Bank's Credit Program and, where relevant, the terms and conditions of the applicable Confirmation. A payment will be deemed delinquent if it is not received by the Bank on or before the applicable payment due date as provided in the Confirmation or otherwise. The Member will maintain in the Member's Deposit Account specified by the Bank an amount at least equal to the amounts then currently due and payable to the Bank on outstanding Advances or otherwise due to the Bank, and the Member hereby authorizes the Bank to debit such Deposit Account from time to time in an amount equal to the amounts then due and payable.

### C. Amortization Payments

If the creditworthiness of the Member, as determined from time to time by the Bank in its sole discretion, does not meet the requirements of the Bank, the Bank may require amortization by means of monthly payments of principal on all or any portion of the Member's outstanding Advances. The Member agrees to begin making monthly amortization payments as required by the Bank upon 30 calendar days' written notice from the Bank

in the amounts, not to exceed 10% of the original principal balance of the subject Advances, as specified in writing by the Bank, plus any prepayment or early termination fees that may be due and payable under the terms of the related Confirmations. The Member will make such payments as long as any amount remains unpaid on the subject Advances or until notified otherwise by the Bank. Amortization payments required pursuant to this Section II.C. will be in addition to all other payments of principal, interest, prepayment fees, and other amounts due and payable to the Bank with respect to any Advances or otherwise.

### D.   Estoppel

Failure of the Member to deliver written notice to the Bank within five business days of the Member's receipt of a Confirmation of Advance specifying any discrepancy or disputed term or condition of the related Advance will constitute the agreement and acknowledgment by the Member that the terms and conditions of the Advance are valid and are those that the Member requested and by which the Member agreed to be bound, and the Member will be estopped from asserting any claim or defense with respect to the repayment of the Advance and all interest and related fees and other charges or with respect to the validity, accuracy, or completeness of information contained in the Confirmation.

### E.   Right of Bank to Make Advances with Respect to Outstanding Commitments

Without limiting the Bank's rights and remedies under Section VII of this Agreement, if any Commitment is outstanding at the time of an Event of Default, the Bank may, at its option and without notice to or request from the Member, make an Advance by crediting a special Deposit Account of the Member in an amount up to the amount of the outstanding Commitment(s). Amounts credited to the special Deposit Account may not be withdrawn by the Member as long as there is an outstanding Commitment. The Bank may apply the funds in the special Deposit Account to satisfy the Bank's obligations under the Commitment(s). When all such obligations have expired or have been satisfied or the Event(s) of Default has been cured or waived, the Bank will disburse the balance, if any, in the special Deposit Account first to the satisfaction of any amounts then due and owing by the Member to the Bank and then to the Member or its successors in interest. Advances made pursuant to this Section II.E. will be payable on demand and will bear interest from the date the Advance is made up to, but not including, the date it is paid at such rate as the Bank may determine in its sole discretion.

### F.   Interest

The Member agrees to pay interest on each Advance at the rate described in the related Confirmation and otherwise as specified in this Agreement or as agreed in writing by the Member and the Bank. The Member agrees to make interest payments using the method specified by the Bank from time to time. Interest with respect to a given type of Advance as specified in the related Confirmation will be determined on the basis described in the related Confirmation and otherwise as described in the Bank's Credit Program for such type of Advance. Accrued interest on each Advance will be due and payable at the times specified in the related Confirmation, the Bank's Credit Program, or otherwise as specified in this Agreement or as agreed in writing by the Member and the Bank.

### G.   Commitment Fees

The Member agrees to pay when due any fees applicable to any Commitments issued by the Bank, including any fees applicable to the amendment or cancellation of such Commitments, as specified in the related Confirmation or the Bank's Credit Program.

### H.   Prepayment Fees

Upon any prepayment of any Advance, including upon any acceleration of the maturity of any Advance or any amortization of principal of any Advance, the Member agrees to pay when due any applicable prepayment fees pertaining to such Advance, as specified in the related Confirmation, the Bank's Credit Program, and otherwise as specified in this Agreement, or as agreed in writing by the Member and the Bank, or as the Bank may require from time to time to conform to law or regulation. Prepayments will be permitted only in accordance with the terms and provisions of the related Confirmation and the Bank's Credit Program.

## III.   Security Agreement

### A.   Creation of Security Interest

As security for all Indebtedness, the Member hereby grants to the Bank a security interest in all Loan Collateral, Securities Collateral, Other Collateral specified pursuant to Section IV.B. or delivered pursuant to Section IV.C., Capital Stock, and Deposit Accounts.

Without limiting the foregoing, all property pledged by the Member to the Bank as Collateral securing Indebtedness and other obligations of the Member to the Bank prior to the date of this Agreement is hereby pledged to the Bank as Collateral under this Agreement.

**B.   Perfection and Priority of Security Interest**

The Member agrees to take all actions as required by the Bank (1) to perfect, or to enable the Bank to perfect, its security interest in the Collateral, including, without limitation, authorizing the filing of financing statements, cooperating with the Bank to ensure that the Bank obtains control of the Collateral, and delivering the Collateral to the Bank or its designee, and (2) to ensure that the Bank has a first priority security interest in Eligible Collateral. To the extent the Bank has filed a financing statement prior to the date of this Agreement, the Member hereby acknowledges, ratifies, confirms, and authorizes such filing.

**IV.   Rights and Covenants Regarding Collateral**

**A.   Collateral Maintenance Requirement**

(1)   The Member will at all times have pledged to the Bank Eligible Collateral that has a Borrowing Capacity at least equal to the Member's then current Collateral Maintenance Level. In the event the aggregate Borrowing Capacity of the Member's Eligible Collateral decreases below the Member's then current Collateral Maintenance Level, the Member will promptly notify the Bank and pledge to the Bank such additional amounts of Eligible Collateral as are necessary to satisfy the Member's then current Collateral Maintenance Level. If at any time any Eligible Collateral ceases to be Eligible Collateral as determined by the Bank in its sole discretion, the Member will promptly grant a security interest to the Bank in additional or substitute Eligible Collateral as necessary to meet the Member's then current Collateral Maintenance Level. Notwithstanding the foregoing, the Bank may elect to exercise its rights under Section VII.A. at any time the aggregate Borrowing Capacity of the Member's Eligible Collateral is below the Member's then current Collateral Maintenance Level.

(2)   Without the prior written consent of the Bank, the Member will not:

(a)   Grant any security interest in, sell, convey, or otherwise dispose of any Collateral pledged pursuant to Section III.A.; or

(b)   To the extent it would result in the Member having pledged with the Bank Eligible Collateral with an aggregate Borrowing Capacity less than the Member's then current Collateral Maintenance Level, foreclose on any property that secures any Loan Collateral.

(3)   Subject to Section IV.C., all Collateral will be held by the Member in trust for the benefit of, and subject to the direction and control of, the Bank and will be physically safeguarded by the Member with reasonable care. The Member will take all action necessary or prudent to protect and preserve the Collateral and the Bank's interest therein, including, without limitation, ensuring that all Loan Collateral is serviced in accordance with the standards of a reasonable and prudent mortgagee.

(4)   Notwithstanding Section IV.A.(3), as the Member receives payments from the obligors of Loan Collateral pledged pursuant to Section III.A., the Member may retain and use such payments received in the ordinary course of its business free and clear of the Bank's security interest in such Collateral only if (a) the Member provides the Bank with a Collateral Update Report at least once each week, (b) no Event of Default exists, (c) the aggregate Borrowing Capacity of the Member's Eligible Collateral is at least equal to the Member's then current Collateral Maintenance Level, and (d) receipt of the payment occurs prior to the Bank's direction to the Member to deliver Loan Collateral to the Bank in accordance with this Agreement.

(5)   The form and sufficiency of all documents pertaining to the Collateral must be satisfactory to the Bank. If any Collateral documents are not satisfactory to the Bank, the Bank may assign a Borrowing Capacity to the related Collateral that is less than the Borrowing Capacity that would otherwise be assigned to such Collateral under the Bank's Credit Program, as the Bank may specify from time to time. Before extending any Advance or Commitment or accepting any Collateral, the Bank may require that the Member make any or all documents pertaining to the Collateral available to the Bank for its inspection and approval.

**B.   Specification and Segregation of Certain Collateral**

(1)   The Member will prepare and deliver to the Bank periodic Collateral Update Reports as specified in this Section IV.B. or in the Bank's Credit Program. From time to time, but at least quarterly, the Member will deliver to the Bank any required Collateral Update Report specifying and describing the Eligible Collateral pledged to the Bank that, together with other Eligible Collateral pledged to the Bank, has an

aggregate Borrowing Capacity as of the date of the Collateral Update Report at least equal to the Member's then current Collateral Maintenance Level.

With respect to a Collateral Update Report that *only* specifies and describes Loan Collateral that the Member requests to be released from the Bank's security interest, the Bank's security interest in the Loan Collateral specified and described in the Collateral Update Report will be released upon receipt of the report but only if the aggregate Borrowing Capacity of the Member's Collateral immediately after such release would be at least equal to the Member's then current Collateral Maintenance Level.  With respect to a Collateral Update Report that specifies and describes *all* Loan Collateral that the Member has pledged or thereby pledges to the Bank and that omits to specify and describe certain Loan Collateral currently pledged to the Bank, the Bank's security interest in the omitted assets will be released upon receipt of such report but only if the aggregate Borrowing Capacity of the Member's Collateral immediately after such release would be at least equal to the Member's then current Collateral Maintenance Level.  The Bank has no obligation to accept any Collateral Update Report or release any Collateral if immediately after such acceptance or release, the Borrowing Capacity of the remaining Collateral would be less than the Member's then current Collateral Maintenance Level.

(2)  If required by the Bank, the Member will endorse and assign, as appropriate, to the Bank all applicable documents evidencing Collateral in such manner as specified by the Bank from time to time. The Member will specify, describe, and deliver to the Bank such writings pertaining to Collateral as the Bank requires from time to time.

(3)  If delivery of a Collateral Update Report is required pursuant to Section IV.B.(1) or the Bank's Credit Program, following the receipt thereof, the Bank may generate a Collateral Confirmation and any other records with respect to the contents of the Collateral Update Report, and may provide the Collateral Confirmation and any such record to the Member. Failure of the Member to deliver written notice to the Bank within seven business days of the date of a Collateral Confirmation specifying any discrepancy on the Collateral Confirmation or any accompanying record prepared by the Bank will constitute the agreement and acknowledgment by the Member of the validity and accuracy of the information contained in the Collateral Confirmation or accompanying record, and the Member will be estopped from asserting any claim or defense with respect to the accuracy or validity of any information contained in the Collateral Confirmation or accompanying record. If the Member delivers timely notice to the Bank with respect to any discrepancy in any Collateral Confirmation or accompanying record, the Bank will promptly consult with the Member and attempt to resolve the matter. The Borrowing Capacity originally assigned to the Collateral by the Bank shall continue to be the Borrowing Capacity of the Member's Collateral until the matter is resolved. Nothing contained in this Agreement or in any Collateral Confirmation or accompanying record or other document provided with any Collateral Confirmation will be construed as an agreement or commitment on the part of the Bank to make an Advance or Commitment to the Member, and the Bank expressly reserves the right to grant or to deny a request by the Member for an Advance or Commitment.

(4)  Notwithstanding anything in this Agreement to the contrary, the Member will be solely responsible for the accuracy and adequacy of all information and data in (a) each Collateral Update Report or other writing specifying and describing any Collateral submitted to the Bank, and (b) any other report, schedule, certification, or document relating to Collateral that is provided by the Member to the Bank. The Bank will have no obligation to make any independent examination of or calculation with respect to the information submitted in a Collateral Update Report (or in any other written report, schedule, certification, or other document that may be submitted by the Member) and, without limiting the generality of the foregoing, the Bank makes no representation or warranty as to the validity, accuracy, or completeness of any information contained in any Collateral Confirmation or accompanying record or other document provided with any Collateral Confirmation.

(5)  The Bank may maintain any and all information contained in each Collateral Update Report or in any other report, schedule, certification, or document relating to Collateral received from the Member in any form or medium. The Member will at all times maintain complete and accurate records and materials supporting or relating to any Collateral Update Report or other report, schedule, certification, or document relating to Collateral information submitted to the Bank and will promptly make the same available, if required, to the Bank. The maintenance and retention of such supporting records and materials will be the sole responsibility of the Member, and the Bank will not be liable for any loss of such information.

(6)  If required by the Bank, the Member will physically segregate any Collateral pledged to the Bank from all other property of the Member in a manner satisfactory to the Bank. For Loan Collateral, the Member will hold the physical note, any certificated Participation, and any other documents that the Member

maintains in physical form for each segregated loan or certificated Participation pledged to the Bank in a separate file folder with each file folder clearly labeled with the loan or other identification number and the name of the mortgagor/debtor.

(7)    If required by the Bank, the Member will provide, at its own expense, a certification by an independent certified public accountant or by another entity acceptable to the Bank that the Member has complied with the terms of this Section IV.B.

**C.   Delivery of Collateral**

(1)    Within five business days of the Bank's written direction, which the Bank may issue at any time in its sole discretion, or immediately at any time that the Member becomes subject to any Collateral delivery requirements that may be established in writing by the Bank, and in either case from time to time thereafter, the Member will deliver to the Bank, or to a bailee designated by the Bank, Eligible Collateral with an aggregate Borrowing Capacity that equals or exceeds the Member's then current Collateral Maintenance Level. Upon receipt of a direction to deliver, the Member will (a) notify any creditor that may seek to take possession of the Loan Collateral that the Collateral will be delivered to the Bank, and (b) take all other actions required by this Agreement to preserve and protect the Collateral and the Bank's security interest, including those actions described in Sections III.B. and IV. The Member hereby authorizes the Bank, upon receipt of Loan Collateral or Other Collateral, to affix or otherwise attach to each note or other related writings labels or stickers containing identification codes or other relevant information. The Member will endorse and assign all Collateral delivered to the Bank in the manner required by the Bank. Concurrently with the initial delivery of Collateral and within 30 calendar days of each subsequent valuation date established by the Bank (and at such other times as required by the Bank), the Member will deliver to the Bank a Collateral Update Report or a writing in such form as may be required by the Bank from time to time, each dated as of the then most recent valuation date, describing the Collateral held by the Bank and any of its bailees. In addition, if required by the Bank, the Member will immediately take such other actions as the Bank deems necessary or appropriate to perfect or protect its security interest in the Collateral.

(2)    With respect to any Securities Collateral pledged to the Bank, the delivery requirements contained in this Agreement and the Bank's Credit Program will be satisfied by the transfer of the securities to the Bank or its agent, such transfer to be effected in such manner and to be evidenced by such documents as the Bank specifies from time to time.

(3)    The Member agrees to pay to the Bank all reasonable fees and charges as may be assessed by the Bank to cover overhead and other costs relating to the receipt, holding, and redelivery of Collateral and otherwise relating to the perfection, protection, and enforcement of the Bank's security interest in the Collateral and to reimburse the Bank for all recording fees and other reasonable expenses, disbursements, and advances incurred or made by the Bank in connection with the Collateral (including the reasonable compensation and the expenses and disbursements of any bailee that may be appointed by the Bank, and the agents and legal counsel of the Bank and of such bailee). Any sums owed to the Bank under this Section IV.C.(3) may be collected by the Bank, at its option, by debiting the Member's Deposit Account specified by the Bank.

**D.   Release and Redelivery of Delivered Collateral**

The Bank will promptly release and redeliver to the Member, at the Member's expense, Collateral delivered to the Bank, upon receipt by the Bank from the Member of:

(1)    A written request to release the Bank's security interest on and redeliver any Collateral pledged to the Bank pursuant to Section III.A. and delivered to the Bank pursuant to Section IV.C.(1),

(2)    A listing of the Collateral (and any other writings required by the Bank) to be released and redelivered, and

(3)    A certificate of a duly authorized signer for the Member certifying that immediately after release, the aggregate Borrowing Capacity of the remaining Eligible Collateral in which the Bank will have a first, prior, and perfected security interest will not be less than the Member's then current Collateral Maintenance Level.

Notwithstanding anything in this Agreement to the contrary, the Bank will have no obligation to release or redeliver the specified Collateral if an Event of Default has occurred and is continuing, or at any time that the Bank determines that release of its security interest would reduce the Borrowing Capacity of the Member's Eligible Collateral below the Member's then current Collateral Maintenance Level, or at any time that the Bank reasonably and in good faith deems itself insecure.

E. **Collateral Audits and Reports**

All Collateral and the Member's compliance with the terms of this Agreement and the Bank's Credit Program will be subject to audit and verification by the Bank. Such audits and verifications may occur without notice during the Member's normal business hours or upon reasonable notice at such other times as the Bank may require. The Member will provide access to, and will make adequate working facilities available to, the representatives or agents of the Bank for purposes of such audits and verifications. The Member agrees to pay to the Bank reasonable fees and charges as may be assessed by the Bank to cover overhead and other costs relating to such audit, verification, and evaluation.

F. **Additional Documentation and Assurances**

The Member will promptly make, execute, and deliver to the Bank such assignments, listings, powers, financing statements, or other instruments and documents with respect to the Collateral and the Bank's security interest therein and in such form as the Bank may require. The Member will immediately take such other actions as the Bank deems necessary or appropriate to create, perfect, and protect the Bank's security interest in the Collateral or otherwise to obtain, preserve, protect, or enforce the Collateral and the Bank's security interest therein.

G. **Bank's Responsibility as to Collateral**

If the Bank takes possession of any Collateral, the Bank's duty as to such Collateral will be solely to use reasonable care in the custody and preservation of the Collateral in its possession, which will not include any steps necessary to preserve rights of the Member against prior or other parties nor the duty to send notices, perform services, or take any action in connection with the management of the Collateral. The Bank will not have any responsibility or liability for the form, sufficiency, correctness, genuineness, or legal effect of any instrument or document evidencing or relating to the Collateral, or any signature thereon or the description or misdescription or value of property represented or purported to be represented by any such document or instrument, or for any error or omission or delay in the liquidation of any Collateral, including the sale, assignment, or delivery of the Collateral or any part thereof, including the settlement, collection, or payment of any Collateral, or any damage resulting therefrom. The Member agrees that any and all Collateral may be removed by the Bank from the state or location where situated and may thereafter be dealt with by the Bank as necessary to protect the Bank's security interest in the Collateral.

H. **Bank's Rights as to Collateral; Power of Attorney**

At any time or times, at the expense of the Member, the Bank may in its discretion, before (unless otherwise specified below) or after the occurrence of an Event of Default, in its own name or in the name of its nominee or of the Member, do any or all things and take any and all actions that are pertinent to the protection of the Bank's interests hereunder and, if such actions are subject to the laws of a state, are lawful under the laws of the State of California, including, without limitation, the following:

(1) Terminate any consent given hereunder, provided that, unless an Event of Default has occurred, the Bank may not withdraw any consent that the Bank specifically agreed in writing not to withdraw absent an Event of Default;

(2) Endorse and assign, as applicable, any Collateral that is in the Member's name or that has been endorsed and assigned by others to the Member's name;

(3) Take any action the Member is required to take or that is otherwise necessary (a) to file a financing statement or otherwise perfect a security interest in any or all of the Collateral, or (b) to obtain, preserve, protect, enforce, or collect the Collateral;

(4) Cause the Collateral to be transferred to the name of the Member, the name of the Bank, or the name of the Bank's nominee; and

(5) After, but not before, the occurrence of an Event of Default, (a) notify obligors on any Collateral to make payments thereon directly to the Bank, (b) enter into any extension, compromise, settlement, or other agreement relating to or affecting any Collateral, and (c) take control of any funds or other proceeds generated by or arising from the Collateral and use the same to reduce Indebtedness as it becomes due.

In accordance with the foregoing Sections IV.H.(1) – (5), the Member hereby appoints the Bank as its true and lawful attorney, for and on behalf of the Member and in its name, place, and stead, to execute, and record endorsements and assignments to the Bank of all or any item of Collateral (including the identification and listing of Loan Collateral), giving and granting to the Bank, as such attorney, full power and authority to do or perform every lawful act necessary or proper in connection therewith as fully as the Member

could or might do. The Member hereby ratifies and confirms all that the Bank lawfully does or causes to be done now or in the future by virtue of this special power of attorney. This special power of attorney is granted for a period commencing on the date hereof and continuing until the discharge of all Indebtedness and all obligations of the Member hereunder regardless of any default by the Member, is coupled with an interest, and is irrevocable for the period granted. As the Member's true and lawful attorney-in-fact, the Bank will have no responsibility to take any steps necessary to preserve rights of the Member against prior or other parties nor the duty to send notices, perform services, or take any action in connection with the management of the Collateral, except as set forth in Section IV.G.

**I.    Application of Payments**

The Bank may, in its sole discretion, apply any payments by or recovery from the Member or any sums realized from Collateral, which are received by the Bank without any designation from the Member (at the time of such payment, recovery, or realization) as to the intended application thereof, at such time and in such manner and order of priority as the Bank deems fit.

**J.    Certain Covenants as to Collateral**

At any time Collateral is pledged to the Bank, the Member covenants and agrees that it will do all of the following, unless the Bank consents otherwise in writing:

(1)    With respect to any Loan Collateral, the Member will cause its borrowers to pay when due (or will pay if such borrowers are unable or cannot be made to pay) all taxes and assessments on the real property and improvements that secure any Loan Collateral or the use thereof. Unless otherwise agreed by the Member and the Bank, the Member will perform each of its obligations as a lender, secured party, or otherwise, under all loan or other agreements pertaining to the Loan Collateral.

(2)    The Member agrees to take any action that the Member or the Bank, in either party's reasonable judgment, deems necessary to preserve the Member's or Bank's rights against any prior or other parties (including, without limitation, endorsers) and any guarantors or sureties with respect to any and all of the chattel paper, documents, or instruments constituting all or any part of the Collateral and to preserve redemption, conversion, warrant, preemptive, or other rights concerning all or any part of such Collateral. Subject to Section IV.G., the Bank may, but need not, take any action that in its reasonable judgment will assist in the preservation of such rights. The Bank's failure to act hereunder will not relieve the Member of the Member's duties under this Section IV.J.(2) or in any way impair or discharge any indebtedness or result in any liability to the Member on the part of the Bank. The Bank will have no duty to take any steps necessary to preserve the rights of the Member against prior or other parties or to initiate any action to protect against the possibility of a decline in the market value or other impairment of such Collateral. Furthermore, except as provided in Section IV.G., the Bank will not be obligated to take any action with respect to such Collateral requested by the Member unless such request is made in writing and the Bank determines, in its discretion, that the requested action would not jeopardize the value of such Collateral as security for Indebtedness or otherwise adversely affect any right or interest of the Bank.

(3)    To the extent a Collateral Update Report is required, the Member will update and provide to the Bank schedules showing such information about the Loan Collateral identified and described in the Collateral Update Report as the Bank may require from time to time. In any event, the Member will immediately identify to the Bank any Loan Collateral that is needed to meet the Member's then current Collateral Maintenance Level and that is classified as nonperforming, nonaccrual, scheduled or criticized, special mention, substandard, doubtful, loss, or the like. Unless otherwise required by the Bank, the Member may make the foregoing classifications according to its own loan criteria, provided that such criteria at least meet applicable regulatory criteria for such classifications.

(4)    With respect to Multifamily Loan Collateral and Commercial Loan Collateral, the Member will obtain and maintain current financial statements, appraisals, rent rolls, and other information as may be required by the Bank supporting or relating to that Loan Collateral and the related real property and improvements and personal property, and the Member will use its best efforts to cause all persons obligated under such Collateral to make the same available, if required, to the Bank.

(5)    The Member hereby agrees to save, hold harmless, indemnify, and defend the Bank against any and all damages, liabilities, losses, claims, causes of action, and expenses (including attorneys' fees and expenses of the Bank's counsel) (for purposes of this Section IV.J.(5), together "Losses," and each a "Loss") that the Bank may directly or indirectly suffer or incur as a result or consequence of any Loss by any person arising out of or connected with the use or creation of any Collateral or any real or personal properties that secure such Collateral, except to the extent such Losses are attributable to the gross

negligence or willful misconduct of the Bank or the failure of the Bank to act in accordance with its responsibilities under Section IV.G. Losses include, without limitation, any Loss arising with respect to any loan transaction involving the Member, or any default or wrongdoing by the Member with respect to any third party, including any nonperformance by the Member of any of its obligations as a lender or otherwise in connection with any such Collateral. Under no circumstances will the Bank be obligated to assume, perform, or fulfill any obligation of the Member as a lender or otherwise. This Section IV.J.(5) will not be interpreted to limit in any way the Member's indemnification of the Bank under Section V.G.(7).

(6)     If required by the Bank, the Member will furnish to the Bank opinions of counsel concerning the Collateral and any related transactions in form and substance acceptable to the Bank.

**K.     Right to Cure Defaults on Loan Collateral**

If the Member fails (1) to obtain or maintain insurance, or to maintain or cause the maintenance of any real property or improvements or personal property secured by any Loan Collateral, or to pay or obtain the payment of any fees, assessments, charges, or taxes arising with respect to any real property or improvements or personal property secured by such Collateral, or to perform any other obligation to the Bank, as specified in this Agreement or in the Bank's Credit Program, or (2) to make any other advances or take any other actions necessary or advisable to preserve or protect any such Collateral, its value, or the Bank's security interest in it, the Bank will have the right to obtain such insurance, or cause such real property or improvements or personal property to be maintained, or pay such fees, assessments, charges, or taxes, or perform such obligations, or make such advances or take such actions, as the case may be. In any such event, the Member agrees to pay the cost thereof immediately to the Bank. All liabilities owing by the Member to the Bank under this Section IV.K. will bear interest from the date when first due at a rate specified by the Bank for such liabilities or, if no rate is specified, at the highest rate of interest in effect on any Indebtedness of the Member to the Bank from time to time, changing with each scheduled change in such rate.

**L.     CDFI Status**

The Bank may, in its sole discretion, by written notice to the Member, require the Member to submit to the Bank, within the time period required by the Bank, a written attestation, certification or other statement or document, in form and substance satisfactory to the Bank, that no events have occurred that would materially affect the Member's strategic direction, mission or business operation, and thereby, its status as a CDFI, eligible to receive an award from the CDFI Fund.

# V.     Representations and Warranties of Member

The Member hereby represents and warrants that, as of the date hereof and as of each date on which there is outstanding an Advance, Commitment, or other Indebtedness:

**A.    ** The Member is certified as a CDFI by the CDFI Fund under the CDFI Act, validly existing, and in good standing with all applicable laws, rules, and regulations.

**B.    ** The Member has full corporate power and authority and has received all corporate and governmental authorizations and approvals (including the approval of its board of directors, which approval is reflected in the minutes of said board) to enter into and perform its obligations under this Agreement, to borrow each Advance, to obtain each Commitment, and to pledge any Collateral.

**C.    ** The Member is not now, and, neither the execution nor the performance of any of the transactions or obligations of the Member under this Agreement will, with the passage of time, the giving of notice, or otherwise, cause the Member to be (1) in violation of its charter or articles of incorporation, by-laws, the Act, or the Regulations; (2) in violation of any other law or administrative regulation, any court decree, or any order of a regulatory authority in any material respect if such violation has, or is reasonably likely to have, an adverse effect on (a) the Member's ability to perform under the Agreement, (b) the Bank's ability to enforce any provision of the Agreement, or (c) the value of the Collateral such that the aggregate Borrowing Capacity of the Member's Eligible Collateral is less than the Member's then current Collateral Maintenance Level; or (3) in default under, or in breach, in each case in any material respect, of any indenture, contract, or other instrument or agreement to which the Member is a party or by which the Member or any of its property may be bound and such default or breach has, or is reasonably likely to have, an adverse effect on (a) the Member's ability to perform under the Agreement, (b) the Bank's ability to enforce any provision of the Agreement, or (c) the value of the Collateral such that the aggregate Borrowing Capacity of the Member's Eligible Collateral is less than the Member's then current Collateral Maintenance Level. This Agreement is the legal, valid, and binding obligation of the Member, enforceable against the Member in accordance with its terms.

D.   The information given by the Member in connection with an application or request for membership, an Advance or a Commitment, or otherwise furnished with respect to this Agreement (except information with respect to Collateral that is governed by Sections V.G.(1) – (6)) is true, accurate, and complete in all material respects, and does not omit to state a fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

E.   Each Advance and Commitment applied for by the Member hereunder will be authorized by the terms and provisions of the Act and the Regulations. Any application for an Advance or Commitment hereunder will be deemed to be a representation by the Member that, as of the date of such application, the Member will be in compliance with the Collateral maintenance requirements set forth in Section IV.A.(1) as of the funding of such Advance or extension of such Commitment.

F.   There is no actual, pending, or, to the knowledge of the Member, threatened litigation and no regulatory action or other similar proceeding or event that (1) does, or with the passage of time is reasonably likely to, materially adversely affect the financial condition or operations of the Member, (2) does, or with the passage of time is reasonably likely to, materially adversely affect the value of the Collateral or any of the rights, interests, or remedies of the Bank with respect to the Collateral, (3) purports to affect the legality, validity, or enforceability of this Agreement, or (4) does, or with the passage of time is reasonably likely to, materially adversely affect the Member's ability to fulfill its obligations under this Agreement. For purposes of this Section V.F., "knowledge" is defined in Section VII.A.(2)(b).

G.   **Collateral**

    (1)   The Member owns and has marketable title to the Collateral and has the right and authority to grant a security interest to the Bank in the Collateral and to subject all of the Collateral to this Agreement.

    (2)   The information given from time to time by the Member to the Bank as to each item of Collateral is true, accurate, and complete in all material respects.

    (3)   All Eligible Collateral meets the standards and requirements with respect thereto from time to time established by the Bank, the Act, the Regulations, and all other applicable laws, rules, regulations, and orders.

    (4)   The Member has not conveyed or otherwise created, and there does not otherwise exist, any participation interest or other direct, indirect, legal, or beneficial interest in any Loan Collateral on the part of anyone other than the Bank and the Member.

    (5)   All signatories to any and all writings that constitute any Collateral are and will be bound as they appear to be by their signatures and have the requisite authority and capacity (corporate or other) to execute such writings.

    (6)   No account debtor or other obligor owing any obligation to the Member with respect to any Loan Collateral has or will have any claims, defenses, offsetting claims, or other condition affecting the right of the Member or the Bank to enforce the writings constituting any Loan Collateral in accordance with the express terms of such writings, and no defaults (or conditions that, with the passage of time or the giving of notice or both, would constitute a default) exist or will exist under any such writings.

    (7)   To the Member's best knowledge (based on information acquired as a result of customary underwriting and servicing procedures), any and all real property or interest in real property that secures any Loan Collateral contains no toxic or hazardous wastes or other toxic or hazardous substance, the presence of which could subject the Bank to any liability under applicable state or federal law or local ordinance either at any time that any Loan Collateral is pledged to the Bank or upon enforcement by the Bank of its security interest therein. The Member hereby agrees to indemnify and hold the Bank harmless against all costs, claims, expenses, damages, and liabilities, including, without limitation, reasonable attorneys' fees and expenses of the Bank, resulting in any way from the presence on any real property or interest in real property that secures Loan Collateral or that otherwise constitutes Collateral of toxic or hazardous wastes or substances.

VI.   **Covenants of Member**

At any time that any Indebtedness remains outstanding or unpaid or the Bank has any Commitment hereunder, the Member covenants and agrees that it will do all of the following, unless the Bank consents otherwise in writing:

**A.  Compliance with Bank's Credit Program**

The Member agrees to comply with the terms and provisions of the Bank's Credit Program, including, without limitation, any reporting requirements, application procedures, or eligibility requirements described in the Bank's Credit Program with respect to particular types of Advances or Collateral. If the Bank's Credit Program is amended, the Member agrees to comply with the terms and provisions of the Bank's Credit Program as so amended from time to time, provided that any outstanding Advances and Commitments existing at the time of any amendment will continue to be governed by the terms and provisions of the related Confirmation. Changes to the Bank's Credit Program will become effective ten business days after the date of the Bank's notice of the change, unless the notice specifies a longer period.

**B.  Compliance with Applicable Laws**

The Member agrees to comply in all material respects with all applicable laws, rules, regulations, and orders.

**C.  Information**

The Member agrees to furnish to the Bank within the timeframe required by the Bank all reports, statements, documents, and other information respecting the condition or operations, financial or otherwise, and Collateral of the Member as the Bank may require from time to time. At any reasonable time and from time to time, the Member agrees that the Bank or its designees may discuss the affairs, finances, and accounts of the Member with any of its officers or directors and with its independent certified public accountants.

**D.  Insurance**

The Member agrees to maintain insurance on the Collateral with financially sound, responsible, and reputable insurance companies or associations in such amounts, containing such terms, for such periods, and covering such risks as is usually carried by companies engaged in similar businesses and owning similar assets. At a minimum, such coverage will include a financial institution bond or similar fidelity bond and coverage for physical damage or destruction to, or loss of, any Loan Collateral notes.

**E.  Notices**

The Member agrees to notify the Bank in writing of the following events within the specified timeframe:

(1)   The Member will notify the Bank promptly after the occurrence of any Event of Default, or any event that, with the giving of notice or passage of time, would constitute an Event of Default.

(2)   The Member will notify the Bank prior to any merger, consolidation, material asset acquisition, material stock acquisition, or material change of ownership to which it is a party.

(3)   The Member will notify the Bank prior to any name change, charter change, or location change of its main, home, or principal office.

(4)   The Member will notify the Bank promptly after the Member becomes aware of any actual or threatened litigation, regulatory action, or other similar proceeding or event that (a) may materially adversely affect the financial condition or operations of the Member. (b) may materially adversely affect the value of the Collateral or any of the rights, interests, or remedies of the Bank with respect to the Collateral, (c) purports to affect the legality, validity, or enforceability of this Agreement, or (d) may materially adversely affect the Member's ability to fulfill its obligations under this Agreement.

(5)   The Member will notify the Bank promptly after the Member becomes aware of any claims against any Collateral needed to meet the Member's then current Collateral Maintenance Level.

(6)   The Member will notify the Bank promptly after the Member becomes aware, or has any reason to believe, that the Member does not meet its then current Collateral Maintenance Level, or that a contingency exists that, with the passage of time, would reasonably be likely to result in the Member failing to meet its then current Collateral Maintenance Level.

(7)   The Member will notify the Bank promptly after the Member becomes aware, through audit or otherwise, of any exception to statements or representations previously made to the Bank with respect to any of the Collateral, any real property or improvements or personal property covered by the lien of any Loan Collateral, or any other matter covered by this Agreement.

(8)   The Member will notify the Bank promptly after the Member becomes aware of any material event that would cause the Member to be ineligible to remain a member of the Bank or to obtain Advances pursuant to the provisions of the Act and the Regulations.

F.   **Additional Covenants by Member**

The Member will (1) maintain a copy of this Agreement in its official records at all times, and (2) use the proceeds from all Advances constituting long-term Advances, as defined in the Bank's Credit Program, only for the purposes of providing funds for residential housing finance.

G.   **Advances and Security Agreement**

The Bank may revise the Advances and Security Agreement from time to time. In accordance with Section IX of this Agreement, the Bank may condition the extension or renewal of any Advance, Commitment, or other transaction upon the Member's execution of any such revised Advances and Security Agreement, provided that no revision shall be effective against or bind the Member unless the Member executes such revised agreement.

H.   **Solvency**

The Member will remain Solvent at all times.

VII.   **Default; Remedies**

A.   **Events of Default; Acceleration**

Upon the occurrence of and during the continuation of any of the following events or conditions of default ("Event of Default"), the Bank may in its discretion, by a notice to the Member, (a) notwithstanding any other provision of this Agreement, declare all Indebtedness (including, without limitation, any accrued interest and any applicable prepayment fees and early termination fees) to be immediately due and payable, without presentment, demand, protest, or any further notice, and (b) notwithstanding any other provision of this Agreement, terminate any obligation on the part of the Bank in respect of any Commitment or to make or continue any Advances:

(1)   Failure of the Member to pay when due the interest on or the principal of any Advance or any other amount due to the Bank;

(2)   Failure of the Member to perform any promise or obligation or to satisfy any condition or liability contained in this Agreement, in any Confirmation, or in any other agreement to which the Member and the Bank are parties, provided however that:

    (a)   This Section VII.A.(2) does not apply to representations or warranties governed by Section VII.A.(3) of this Agreement;

    (b)   With respect to the Member's promises and obligations to (i) submit reports, statements, documents (except documents that constitute Loan Collateral, which must be delivered in accordance with the time requirements of Section IV.C.), and other information to the Bank as and when required by this Agreement and the Bank's Credit Program, (ii) provide certifications as and when required by this Agreement and the Bank's Credit Program, and (iii) provide any notice that is not required by Section VI.E. or Section IV.A.(1), an Event of Default will not occur until the close of the fifth calendar day after the Member has knowledge of its failure or receives notice from the Bank of the Member's failure to comply with such promise or obligation;

    For purposes of this Section VII.A.(2)(b), "knowledge" means, with respect to the Member, any time when any of the following individuals knows in fact or should have known of a particular fact or circumstance: (i) the chairman, chief executive officer, president, chief operating officer, chief financial officer, treasurer, or any senior corporate executive of the Member, or (ii) any other employee or agent authorized to act on behalf of the Member in connection with this Agreement;

(3)   (a)   Credible evidence coming to the attention of the Bank that any certification or statement of Borrowing Capacity, or any representation, statement, or warranty made or furnished in any manner to the Bank by or on behalf of the Member pursuant or with respect to Sections V.G.(1) – (6), is false, misleading, or incomplete in any material respect and amount, provided that any amount is *per se* material if the Member's aggregate Borrowing Capacity of its Eligible Collateral as determined by the Bank based on the most recent information available to the Bank is less than the Member's then current Collateral Maintenance Level;

    (b)   Excluding any representation, statement, or warranty governed by Section VII.A.(3)(a), credible evidence coming to the attention of the Bank that any representation, statement, or warranty made or furnished in any manner to the Bank by or on behalf of the Member in connection with any Advance, any Commitment, any Collateral, or in any agreement with or for the benefit of the Bank, is false, misleading, or incomplete in any material respect;

(4)     Failure of the Member to maintain adequate Eligible Collateral free of any encumbrances or claims as required in this Agreement;

(5)     (a)     The issuance of any tax levy or seizure, attachment, garnishment, levy of execution, or other similar process in the collection of taxes against the Member by any relevant governmental entity or court with respect to the Collateral needed to satisfy the Member's then current Collateral Maintenance Level;

        (b)     The issuance of any tax lien or similar tax filing by any relevant governmental entity or court against the Member with respect to the Collateral needed to satisfy the Member's then current Collateral Maintenance Level, and:

                (i)     The lien or filing, together with all other tax liens and filings against the Member, equals an aggregate amount greater than the lesser of $10 million or 10% of the Member's Net Assets; or

                (ii)    30 calendar days have passed since the issuance of the tax lien or filing, and the tax lien or filing has not been discharged or, if contested, has not been stayed or bonded within this 30-day period; provided that, if the tax lien or filing is stayed or bonded during this 30-day period, then (x) no Event of Default will occur as long as the stay or bond is in effect, but (y) an Event of Default will occur immediately at the time the stay is lifted or the bond expires if the lien or filing has not otherwise been discharged; or

                (iii)   The relevant taxing authority can obtain an effective security interest prior to the security interest of the Bank in Collateral, and the Member (x) does not have available to pledge additional Eligible Collateral in the amount of the tax lien or filing, and (y) upon obtaining knowledge of the tax lien or filing, does not promptly pledge to the Bank additional Eligible Collateral equal to the amount of the tax lien or filing, in which case the Event of Default will have occurred upon issuance of the tax filing.

                        For purposes of Section VII.A.(5)(b)(iii), "knowledge" is defined in Section VII.A.(2)(b), "promptly" means as soon as commercially reasonably and in no case more than five calendar days, and "Eligible Collateral" means Loan Collateral and Securities Collateral that, except for the tax lien or filing, otherwise meet the definition of "Eligible Collateral."

(6)     The occurrence of any event, or any suspension of payment by the Member to any creditor of sums due, in either case, that results (or that with the giving of notice or passage of time or both will result) in acceleration of the maturity of any indebtedness of the Member to others under any security agreement, indenture, loan agreement, or other undertaking in excess of the lesser of $10 million or 1% of the Member's Net Assets;

(7)     (a)     Commencement by the Member or any subsidiary or any parent of the Member (together "the Petitioner") of any case, proceeding, or other action under any applicable law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, or relief of debtors (i) seeking to have an order for relief entered with respect to the Petitioner, or seeking to adjudicate the Petitioner bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief in respect to the Petitioner or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator, liquidator, or other similar official for the Petitioner or for all or any substantial part of its assets;

        (b)     Making of a general assignment for the benefit of its creditors by the Member or any subsidiary or any parent;

        (c)     Commencement against the Member, any subsidiary, or any parent of any case, proceeding, or other action of a nature referred to in Section VII.A.(7)(a) above, except that no Event of Default will occur if the action is dismissed or stayed within 60 calendar days from commencement unless, prior to any dismissal or stay of the action, (i) the Bank makes a determination in good faith that an event has occurred or a condition exists such that the prospect of the Member's ability to operate, the Member's ability to perform its obligations under this Agreement, or the Bank's ability to enforce the provisions of this Agreement is impaired, (ii) the case, proceeding, or action has resulted in the entry of an order for relief or any such adjudication or appointment, (iii) a federal or state government agency, in any capacity, including as a receiver or conservator (collectively, an "Agency"), or any entity under the control of an Agency, is a party to, or commenced, filed, or otherwise initiated, the case, proceeding, or action, or (iv) the subsidiary or parent has pledged Collateral to the Bank to satisfy the Member's then current Collateral Maintenance Level;

(d)   Commencement against the Member, any subsidiary that constitutes 5% or more of the Member's assets, any subsidiary that has pledged its assets as Collateral for Advances, or any parent of any case, proceeding, or other action seeking issuance of attachment, execution, seizure, or other similar process against all or any substantial part of the Member's, subsidiary's, or parent's assets, except that no Event of Default will occur if the action is dismissed or stayed within 60 calendar days from commencement unless, prior to any dismissal or stay, the Bank makes a determination in good faith that an event has occurred or a condition exists such that the prospect of the Member's ability to operate, the Member's ability to perform its obligations under this Agreement, or the Bank's ability to enforce the provisions of this Agreement is impaired;

(e)   Taking of any action by the Member, any subsidiary, or any parent in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Sections VII.A.(7)(a), (b), (c), or (d) above; or

(f)   Inability of the Member or any subsidiary or any parent, or admission of any such party in writing of its inability, to pay its debts as they become due;

(8)   Sale by the Member of all or a material part of the Member's assets or the taking of any action by the Member to liquidate or dissolve;

(9)   Termination of the Member's membership in the Bank or the Member's ceasing to be a type of institution that is eligible under the Act to become a member of the Bank or the Member's failure to satisfy any requirement under the Act for remaining a member of the Bank or obtaining or holding an Advance;

(10)  Merger, consolidation, or other combination of the Member with an entity that is not a member of the Bank if the nonmember entity is the surviving entity;

(11)  The Member has borrowed, or committed to borrow, from any source an amount that is greater than the amount the Member is permitted to borrow under applicable law;

(12)  The Bank reasonably and in good faith determines that a material adverse change has occurred in the financial condition of the Member or in the Collateral from that disclosed previously to the Bank; or

(13)  The Bank reasonably and in good faith deems itself insecure even though the Member is not otherwise in default.

**B.   Remedies**

Upon the occurrence of any Event of Default, the Bank will have all of the rights and remedies provided by applicable law, including, without limitation, all of the remedies of a secured party under the Uniform Commercial Code as in effect in the State of California. In addition, the Bank may take immediate possession of any or all of the Collateral wherever it may be found. The Bank may sell, assign, and deliver all or any part of the Collateral at public or private sale for such price as the Bank deems appropriate without any liability for any loss due to increase or decrease in the market value of the Collateral during the period held. The Bank will have the right to purchase all or part of the Collateral at such sale. If the Collateral includes instruments or securities that will be redeemed by the issuer upon surrender, or any accounts or deposits in the possession of the Bank, the Bank may realize upon such Collateral without notice to the Member. If any notification of intended disposition of any of the Collateral is required by applicable law, such notification will be deemed reasonable and properly given if mailed, postage prepaid, at least ten calendar days before any such disposition to the address of the Member appearing on the records of the Bank. Upon the occurrence of any Event of Default, the Bank may, in its sole discretion, apply any payment by or recovery from the Member or any sum realized from Collateral, at such time and in such manner and order of priority as the Bank determines, without regard to any contrary intention or request on the part of the Member or the provisions of any other agreement between the Bank and the Member. The Member agrees that the Bank may exercise its rights of setoff upon the occurrence of an Event of Default in the same manner as if the Advances, Commitments, or other Indebtedness were unsecured. Notwithstanding any other provision of this Agreement, upon the occurrence of any Event of Default at any time when all or any part of the obligations of the Member to the Bank are the subject of any guarantee by a third party for the Bank's benefit and there exist other outstanding obligations of the Member to the Bank that are not so guaranteed but that are secured by the Collateral, then any sums realized by the Bank from the Collateral, or from any other collateral pledged or furnished to the Bank by the Member under any other agreement, will be applied first to the satisfaction of the nonguaranteed obligations and then to the Member's guaranteed obligations. The Member agrees to pay all of the costs and expenses of the Bank in the collection of the Indebtedness, the enforcement and preservation of the Bank's rights and remedies under or related to this Agreement, and the disposition of

Collateral, including, without limitation, reasonable attorneys' fees and expenses. The Bank, at its discretion, may apply any surplus after payment of the Indebtedness, provision for repayment to the Bank of any amounts to be paid or advanced under outstanding Commitments, and payment of all costs of collection and enforcement, to third parties claiming a secondary security interest in the Collateral, with any remaining surplus paid to the Member. The Member will be liable to the Bank for any deficiency remaining.

C.   **Payment of Prepayment and Early Termination Charges**

Any prepayment or early termination fees or charges for which provision is made under the related Confirmation, the Bank's Credit Program, or otherwise as specified in this Agreement, or as agreed in writing by the Member and the Bank, or as the Bank may require to comply with, or conform to, applicable law or regulation, with respect to any Advance will be due at the time of any voluntary or involuntary payment of the principal of the Advance prior to its originally scheduled maturity, including, without limitation, any payment that is made in connection with the liquidation of the Member or that becomes due as a result of an acceleration by the Bank pursuant to Section VII.A. or an amortization required by the Bank pursuant to Section II.C., whether such payment is made by the Member; by a trustee, conservator, receiver, liquidator, custodian, or similar official, for the Member; or by any successor to or any assignee of the Member or any other entity for or on behalf of the Member.

D.   **Default Rate**

Any payment of principal or interest or any other sum that is not made to the Bank when due (whether at stated maturity, by acceleration, or otherwise) will bear interest, to the maximum extent permitted by applicable law, for each day during the period commencing on the due date through, but not including, the date the amount is paid in full, at a rate per annum equal to one percentage point above the interest rate that otherwise would be applicable to any such payment of principal, or, if such payment does not constitute a principal sum, then at a rate equal to one percentage point above such rate as the Bank may determine in its sole discretion.

E.   **Certain Provisions as to Sale of Securities Collateral**

In view of the possibility that federal and state securities laws and other applicable federal and state laws may impose restrictions on the method by which a sale of the Collateral may be effected, the Bank and the Member agree that any sale of the Collateral as a result of an Event of Default that does not comply with the Securities Act of 1933 or any other applicable federal or state securities law or other applicable federal or state law does not prevent the sale from being "commercially reasonable." The Bank and the Member further agree that from time to time the Bank may attempt to sell the Collateral by means of private placement. In so doing, the Bank may restrict the bidders and prospective purchasers to those that will represent and agree that they are purchasing for investment only and not for distribution or otherwise impose restrictions deemed appropriate by the Bank for the purpose of complying with the requirements of applicable securities laws. The Bank may solicit offers to buy such Collateral, for cash or otherwise, from a limited number of investors deemed by the Bank to be responsible parties that might be interested in purchasing such Collateral. If the Bank solicits offers from at least three such investors, then the acceptance by the Bank of the highest offer received (whether or not three offers are received) from a qualifying investor will be deemed to be a commercially reasonable method of disposing of the Collateral.

VIII.   **Assignment of Indebtedness and Sale of Participations**

The Member hereby gives the Bank the full right, power, and authority to pledge or assign to any party all or part of the Indebtedness, together with all or any part of the Collateral, as security for any consolidated Federal Home Loan Bank obligations issued pursuant to the provisions of the Act or for any other purpose authorized by the Act, the Regulations, or the Finance Agency. In the case of any such pledge or assignment, the Bank will have no further responsibility with respect to Collateral transferred to the pledgee or assignee, and all references herein to the "Bank" will be read to refer to the pledgee or assignee. The Member may not (voluntarily or involuntarily or by operation of law or otherwise) assign or transfer any of its rights or obligations hereunder or with respect to any Advances, Commitments, or other Indebtedness without the express prior written consent of the Bank. The Bank may at any time sell, assign, grant participations in, or otherwise transfer to any other person or entity, including, without limitation, another Federal Home Loan Bank (a "participant"), all or part of the Indebtedness of the Member then outstanding hereunder. The Member hereby acknowledges and agrees that any such disposition will give rise to a direct obligation of the Member to the participant. The Member hereby authorizes the Bank and each participant, in case of any Event of Default under this Agreement, to proceed directly, by right of setoff, banker's lien, or otherwise, against any assets of the Member which may at the time of such default be in the respective hands of the Bank or any such participant. The Member further agrees that the Bank may furnish any information pertaining to the Member that is in the possession of the Bank to any prospective participant to assist it in evaluating such

participation, provided that any non-public information reasonably designated in writing to the Bank by the Member as constituting non-public information will be furnished to such prospective participant on a confidential basis.

## IX.     Discretion of Bank to Grant or Deny Advances or Commitments

Nothing contained herein or in any documents describing or setting forth the Bank's Credit Program will be construed as an agreement or commitment on the part of the Bank to grant Advances or extend Commitments hereunder, or to enter into any other transaction, and the right and power of the Bank in its discretion to either grant (with or without conditions) or deny any Advance or to extend any Commitment or enter into any other transaction requested hereunder is expressly reserved. Any determination by the Bank of the Borrowing Capacity of any Collateral pledged hereunder will not constitute a determination by the Bank that the Member may obtain Advances or Commitments in amounts up to such Borrowing Capacity or otherwise.

## X.     Amendment; Waivers

No modification, amendment, or waiver of any provision of this Agreement or consent to any departure therefrom will be effective unless executed by the party against which such change is asserted and will be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Member in any case will entitle the Member to any other or further notice or demand in the same or similar or other circumstances. Any forbearance, failure, or delay by the Bank in exercising any right, power, or remedy hereunder will not be deemed to be a waiver thereof, and any single or partial exercise by the Bank of any right, power, or remedy hereunder will not preclude the further exercise thereof. Every right, power, and remedy of the Bank will continue in full force and effect unless specifically waived by the Bank in writing.

## XI.     Jurisdiction; Legal Fees

In any action or proceeding brought by the Bank or the Member to enforce any right or remedy under or related to this Agreement, the parties hereby consent to and agree that they will submit to the jurisdiction of the United States District Court for the Northern District of California or, if such action or proceeding may not be brought in federal court, the jurisdiction of the Superior Court of the City and County of San Francisco to the exclusion of all other courts. The Member agrees that, if any action or proceeding is brought by the Member seeking to obtain any legal or equitable relief against the Bank in connection with this Agreement or any transaction contemplated hereby, and such relief is not granted by the final decision of a court of competent jurisdiction, after any and all appeals, the Member will pay all attorneys' fees and other costs incurred by the Bank in connection with the action or proceeding. The Member agrees to reimburse the Bank for all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Bank in connection with the enforcement or preservation of the Bank's rights under or related to this Agreement, including, without limitation, its rights in respect of any Collateral and the audit or possession of the Collateral.

## XII.     Applicable Law; Severability

This Agreement and all Advances and Commitments made under this Agreement will be governed by the statutory and common law of the United States and, to the extent federal law incorporates or defers to state law, the laws of the State of California (excluding, however, the conflict of laws rules of the State of California). Notwithstanding the foregoing, the Uniform Commercial Code as in effect in the State of California will be deemed applicable to this Agreement, and to any Advance or Commitment made and to any Collateral pledged under this Agreement. In the event that any portion of this Agreement conflicts with applicable law, such conflict will not affect other provisions of this Agreement that can be given effect without the conflicting provision, and to this end the provisions of this Agreement are declared to be severable.

## XIII.     Successors and Assigns

This Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the Member and the Bank.

## XIV.     Notices

Any notice, advice, request, consent, or direction given, made, or withdrawn pursuant to this Agreement must be made in writing or by electronic transmission, and will be deemed to have been duly given to and received by a party when mailed to such party at its given address by first-class mail, or if by personal delivery or electronic transmission, when actually received by such party at its main, home, or principal office.

## XV.     Consent to Receive Information and Communications

The Member hereby grants the Bank its express permission, invitation, and consent to send to the Member from time to time notices, announcements, bulletins, press releases, and other information and communications, some of which may be deemed advertisements, concerning the Bank and its products and services and other information that the Bank believes may be of interest or benefit to the Member, by mail, delivery service, e-mail, or facsimile to

the address(es), e-mail address(es), and facsimile number(s) as the Member has indicated or will indicate to the Bank from time to time.

## XVI.   Agreement Interpretation

The parties agree that this Agreement will be interpreted in a fair, equal, and neutral manner as to each of the parties, notwithstanding the provisions of Section 1654 of the California Civil Code or any similar common law.

## XVII.  Entire Agreement

This Agreement embodies the entire agreement and understanding between the parties relating to the subject matter and supersedes all prior agreements between the parties that relate to the subject matter. Notwithstanding the above, Advances and Commitments made by the Bank to the Member prior to the execution of this Agreement will continue to be governed by the terms of the Confirmation pursuant to which such Advances and Commitments were made, and otherwise by the terms and conditions of this Agreement.

**IN WITNESS WHEREOF,** the Member and the Bank have caused this Agreement to be signed in their names by their duly authorized officers as of the date first mentioned above.

| Full Corporate Name of Member | |
|---|---|
| Commerce Home Mortgage, LLC | |
| Authorized Signature* | Authorized Signature* |
| Name | Name |
| Mario De Tomasi | Ravi Correa |
| Title | Title |
| Chief Executive Officer | Chief Financial Officer |

\* Note: This Agreement must be signed in accordance with the Member's authorizations on file with the Bank, and the accompanying acknowledgment form must be completed by a Notary Public.

## Federal Home Loan Bank of San Francisco

| Authorized Signature | Authorized Signature |
|---|---|
| Name | Name |
| Title | Title |

**Mail this form to:**

Federal Home Loan Bank of San Francisco
600 California Street, Suite 300
San Francisco, CA 94108

or

Federal Home Loan Bank of San Francisco
P.O. Box 7948
San Francisco, CA 94120

**FHLBank
San Francisco**

**Acknowledgment of
Member's Signature (Arizona)**

State of Arizona

County of _____

On this _____ day of _____, before me personally appeared _____

_____ (name of signer) whom I know personally or whose identity
was proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this document, and
who acknowledged that he/she signed the above/attached document.

(Notary Seal)

_____
Notary Public Signature

FC 2349 (4/14)

**△ FHLBank**
**San Francisco**

**Acknowledgment of**
**Member's Signature (California)**

State of California

County of Contra Costa County

On August 29, 2018 _____ before me, DonnaMarieSmith Rodriguez

personally appeared Ravi Correa

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

(Notary Seal)

_____
Notary Signature

DONNA MARIE SMITH RODRIGUEZ
COMM. # 2178392
NOTARY PUBLIC-CALIFORNIA
CONTRA COSTA COUNTY
MY COMM. EXP. JAN. 31, 2021

**FHLBank**
**San Francisco**

**Acknowledgment of**
**Member's Signature (Nevada)**

State of Nevada

County of _____

This instrument was acknowledged before me on _____ (date)

by _____ (name(s) of person(s)) as

_____ (type of authority, e.g. officer, trustee, etc.) of

_____ (name of party on behalf of whom instrument was executed).

(Notary Stamp)

_____
Signature of Notorial Officer

**CERTIFICATE OF SERVICE**
*Commerce Home Mortgage, LLC v. Federal Home Loan Bank of San Francisco*
Case No.:  CGC-21-588997

I am a resident of the State of California, over the age of eighteen years and not a party to the action in which service is made.  My business address is 10880 Wilshire Blvd., Los Angeles, CA 90024.

On June 8, 2021, I served the foregoing document: **FIRST AMENDED COMPLAINT FOR:  (1) FRAUD (2) VIOLATIONS OF CAL. BUS. & PROF. CODE §17200, et seq. (3) BREACH OF CONTRACT and JURY TRIAL DEMANDED**  on all interested parties by the service listed below in this action as follows:

**– SEE ATTACHED SERVICE LIST –**

[  ]   **BY U.S. MAIL:**  I caused such envelope to be deposited in the mail at Irvine, California. The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the law firm's practice of collection and processing correspondence for mailing.  Under the practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of a party served, service is presumed invalid if the postal cancellation date or postage meter is more than one day after the date of deposit for mailing.

[  ]   **BY PERSONAL SERVICE:**  I delivered to an authorized courier or driver authorized by ASAP Corporate Services to receive documents to be delivered on the same date.  A proof of service signed by the authorized courier is maintained in this office and available for inspection upon reasonable demand.

[ X ]   **BY ELECTRONIC MAIL:**  By personally transmitting to the above-named person(s), who has previously agreed to receive documents via electronic mail, to the e-mail address as shown above, on the date and time listed below, originating from the Michelman & Robinson, LLP's electronic mail address.  A true copy of the above-described document(s) was transmitted by electronic transmission through the Michelman & Robinson, LLP's mail server, which did not report any error in sending the transmission.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 8, 2021, at Los Angeles, California.

*Susan Bailey*
Susan Bailey

**ATTACHED SERVICE LIST**
*Commerce Home Mortgage, LLC v. Federal Home Loan Bank of San Francisco*
Case No.:  CGC-21-588997

Polly Towill, Esq.
John M. Landry, Esq.
Madalyn A. Macarr, Esq.
Chung H. Chan, Esq.
**SHEPPARD, MULLIN, RICHTER &**
**HAMPTON, LLP**
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
Tel: (213) 620-1780
Fax: (213) 620-1398
Emails: ptowill@sheppardmullin.com
        jlandry@sheppardmullin.com
        mmacarr@sheppardmullin.com

*Attorneys for Defendant FEDERAL*
*HOME LOAN BANK OF SAN*
*FRANCISCO*

**CERTIFICATE OF SERVICE**